# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-DP-00689-SCT

*TONY TERRELL CLARK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/21/2018 |
| TRIAL JUDGE: | HON. JOHN H. EMFINGER |
| TRIAL COURT ATTORNEYS: | BENTLEY E. CONNER |
| | WILLIAM R. LABARRE |
| | WESLEY THOMAS EVANS |
| | JOHN K. BRAMLETT, JR. |
| | BRYAN P. BUCKLEY |
| | MICHAEL GUEST |
| | GREGORY VINSON MILES |
| | ASHLEY RIDDLE ALLEN |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| | BRAD ALAN SMITH |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/12/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.　A Madison County jury found Tony Terrell Clark guilty of capital murder, attempted

murder, and possession of a firearm by a previously convicted felon.  The jury sentenced

Clark to death by lethal injection. After careful review of the record and Clark's arguments, we find no reversible error. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the night of October 27, 2014, Fahd Saeed and his thirteen-year-old son Muhammed were working together in Fahd's convenience store in Canton, Mississippi. Fahd had immigrated to the United States from Yemen in the 1990s when he was thirteen years old. He grew up in California working with his parents in convenience stores, and he eventually moved to Canton where he continued to work in convenience stores until he was able to buy his own store, which he named Fat Boy. Fahd and Muhammed lived in the back of the store; Fahd's wife and two daughters lived in Yemen.

¶3. At approximately 10:10 p.m. that evening, Muhammed was working the cash register while Fahd was sitting directly behind him on FaceTime with Muhammed's mother in Yemen. Muhammed had just finished a transaction with regular customer Marcus Anderson when Clark and his nephew Teaonta Clark walked into the store. No other customers were in the store at the time.

¶4. Without saying a word, Clark walked up to Muhammed and shot him in the left side of the head at point-blank range, killing him instantly. Clark then attempted to shoot Fahd, but the gun jammed. Clark immediately racked the gun's slide, walked around the service counter and pointed the gun at Fahd's head. Fahd managed to push the gun away. Clark then shot Fahd in the stomach and demanded that Fahd "give it up."

2

¶5.    Clark walked over to the cash register, stepping over Muhammed's body while reaching down and grabbing Muhammed's cell phone. Clark asked Teaonta where Fahd kept the store's money, and Clark attempted to open the cash register. At that moment, a vehicle drove up to the store. Teaonta alerted Clark, and the two men left the store with Muhammed's cell phone. Two women exited the vehicle and walked inside the store where they saw Muhammed's body lying on the ground, and one of the women immediately called 911.

¶6.    Authorities quickly identified Clark and Teaonta as the suspects. Anderson, who knew Clark and Teaonta, saw the two men enter the store as he was leaving. Anderson was standing just outside the store when Clark shot Muhammed; Anderson ran as soon as he heard the first shot. He went to the police station later that night and gave a statement to the authorities.

¶7.    Fahd also knew Clark and Teaonta. Teaonta was a frequent customer at the store, and Clark had shopped there on occasion. Fahd identified Clark as the shooter at trial.

¶8.    The most damning evidence in the case came from the video authorities retrieved from the store's seven surveillance cameras, which showed Clark and Teaonta entering the store and Clark shooting Muhammed. The video also captured Clark behind the counter grabbing Muhammed's cell phone and then attempting to open the cash register.

¶9.    Clark and Teaonta were apprehended in Dallas, Texas, a week later. Both were indicted for capital murder, attempted murder, and conspiracy to commit armed robbery. Clark also was indicted as a habitual offender and charged with unlawful possession of a

firearm by a previously convicted felon. The State elected not to proceed on the conspiracy charge.

¶10. The State called six witnesses during the guilt phase of trial, including Fahd and Anderson. And the State submitted the video evidence from the store's surveillance cameras. The defense called no witnesses during the guilt phase. The jury found Clark guilty of capital murder, attempted murder, and possession of a firearm by a convicted felon.

¶11. The State adopted and incorporated its evidence from the guilt phase to the sentencing phase and presented additional testimony from Fahd. Clark presented six witnesses during the sentencing phase. The jury sentenced Clark to death for killing Muhammed during the commission of a robbery.

¶12. The trial court entered a sentence of death by lethal injection for Clark's capital murder conviction. The trial court sentenced Clark to forty years' imprisonment for attempted murder and to ten years for possession of a firearm by a convicted felon as a habitual offender under Mississippi Code Section 99-19-81, with both sentences to run consecutively.

¶13. Clark appeals, raising the following issues:

I. **Was the jury constituted and selected in violation of the United States and Mississippi constitutions and controlling Mississippi law?**

II. **Must Tony Clark's death sentence be vacated and replaced with a sentence of life in prison without the possibility of parole because the trial court reversibly erred when, after failing to properly instruct the jury on the consequences of verdicts either to impose a life sentence or to fail to agree on sentence, it denied Clark's**

4

**motions to discharge the jury and impose a LWOP sentence for capital murder when the jury could not, in fact, agree on sentence?**

**III.   Must the capital murder conviction be reversed because the trial court erroneously refused to instruct the jury on the lesser included offense of child homicide?**

**IV.   Must the death sentence be vacated because all of the aggravating circumstances instructed on were unsupported by the evidence and/or applicable law and because the jury was not instructed on a mitigating circumstance for which there was evidence?**

**V.   Did the trial court reversibly err in its evidentiary rulings at both phases of the trial?**

**VI.   Was the indictment constitutionally and statutorily sufficient to charge capital murder and/or to support imposition of a death sentence in the event of a conviction?**

**VII.   Is the death sentence in this matter constitutionally and statutorily disproportionate?**

**VIII.   Does the cumulative effect of the errors in the trial court require reversal of all convictions and vacating all sentences imposed?**

¶14.   "The Court applies heightened scrutiny when reviewing capital murder convictions where the death penalty has been imposed." *Dickerson v. State*, 175 So. 3d 8, 15 (Miss. 2015) (citing *Fulgham v. State*, 46 So. 3d 315, 322 (Miss. 2010)).

**I.   Was the jury constituted and selected in violation of the United States and Mississippi constitutions and controlling Mississippi law?**

**A.   The prosecution *flouted* the Fourteenth Amendment and discriminatorily "whitewashed" the jury that heard this case, in order to secure a jury that was overwhelmingly white and therefore more likely to be receptive to the racial "dog whistles" it used at trial to secure the verdicts of conviction and death it was seeking against Clark.**

¶15. During jury selection, the prosecution exercised seven of twelve peremptory strikes against black jurors and five against white jurors. The seated jury was comprised of eleven white jurors, one black juror, and two white alternate jurors.

¶16. After the prosecution had struck five black jurors, the defense raised a challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), claiming the prosecution's strikes showed a pattern of discrimination based on race. The prosecution responded that it had exercised nine peremptory strikes; of those, five were black, and four were white. The prosecution claimed there was not a pattern of discrimination. The trial court found that the defense had made a prima facie showing under *Batson* and asked the prosecution to provide race-neutral reasons for the strikes.

¶17. At the start of the *Batson* hearing, the prosecution informed the trial court it had mistakenly used a peremptory strike against Prospective Juror Number 44 (Ragland), a white prospective juror. Without objection from the defense, the trial court allowed the prosecution to withdraw that strike. The trial court then heard arguments on the prospective black jurors struck by the prosecution preceding Prospective Juror Number 44 (Ragland), which reduced the total from five to four. These four were Prospective Juror Number 2 (Alexander), Prospective Juror Number 6 (Esco-Johnson), Prospective Juror Number 24 (Ammons), and Prospective Juror Number 28 (Majors). After hearing the prosecution's reasons for striking each and the defense's arguments against those reasons, the trial court found no purposeful discrimination.

¶18.  Jury selection continued.  The prosecution struck three more black jurors, Prospective Juror Number 46 (Luckett), Prospective Juror Number 61 (Love), and Prospective Juror Number 81 (Day).  Finding a prima facie showing, the trial court conducted another ***Batson*** hearing after which the court found no purposeful discrimination with the prosecution's peremptory strikes.

¶19.  Relying on the Supreme Court's decision in ***Flowers v. Mississippi***, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019), which reversed this Court's decision in ***Flowers v. State***, 240 So. 3d 1082 (Miss. 2017), Clark claims that the State treated black and white venire members differently overall.  Clark alleges that the State targeted African-Americans for removal through racially disparate questioning; outside investigation of two black jurors, but no outside investigation of white jurors; and by seeking challenges for cause against black prospective jurors.  He submits that the State peremptorily struck "seven of the eight African Americans who, despite these efforts, remained in the final venire it passed upon."  And the State offered "factually false, group-based, not case-related, racially disparate, and/or otherwise pretextual justifications for making the strikes."  Clark further contends that "[t]here is also evidence of a fairly recent history of similar behavior on the part of the office prosecuting this case, and of a race-based reason for having as white a jury as possible seated given how the State presented and argued its evidence in this case."

¶20.  The State contends that except for Clark's claim that the State investigated two black jurors but no white jurors, none of Clark's arguments were presented to the trial court for consideration.  The State argues that while ***Flowers*** gave examples of evidence a defendant

may present "to support a claim that a prosecutor's peremptory strikes were made on the basis of race," the Court explicitly acknowledged that this type of evidence is for "the trial judge [to] consider in evaluating whether racial discrimination occurred[.]" *Flowers*, 139 S. Ct. at 2243.[1] The State argues that not only did Clark fail to ask the trial court to consider the alleged indicia of pretext he presents for the first time on appeal, but the facts and circumstances he asks this Court to consider for the first time on appeal have no probative value.

### *Batson*'s three-step test

¶21. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers*, 139 S. Ct. at 2244 (citing *Foster*, 578 U.S. at 499). Claims challenging

---

[1] The *Flowers* Court gave the following examples of evidence a defendant may offer the trial court to show the prosecution's strikes were race-based:

• statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

• evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

• side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

• a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

• relevant history of the State's peremptory strikes in past cases; or

• other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* (citing *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016); *Snyder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008); *Miller-El II v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *Batson*, 476 U.S. 79.

the use of race-based peremptory strikes require the application of ***Batson***'s three-step test. A defendant must first make a prima facie case that race motivated the challenged strikes. ***Batson***, 476 U.S. at 96-97. If the defendant carries this burden, the prosecutor must provide race-neutral reasons for the challenged strikes. ***Id.*** at 97-98. Finally, at step three, the trial court considers whether the defendant has carried his burden of proving purposeful discrimination. ***Id.*** at 98. In other words, "the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination." ***Eubanks v. State***, 291 So. 3d 309, 319 (Miss. 2020) (quoting ***H.A.S. Elec. Contractors, Inc. v. Hemphill Constr. Co.***, 232 So. 3d 117, 133 (Miss. 2016)).

¶22. The ***Batson*** hearing transcript shows as follows:

### 1. Prospective Juror Number 2 (Alexander)

¶23. The State used its second strike against Prospective Juror Number 2, Alexander. The State's race-neutral reasons for striking Alexander were that her answers to questions 35 and

9

36[2] on the juror questionnaire showed that she opposed the death penalty, that she opposed capital punishment under any circumstances, and that she was seventy-six years old.

¶24. The defense attempted to rebut only one of the State's race-neutral reasons, claiming that although Alexander answered question 36 by marking that she was opposed to capital punishment under any circumstances, there were members of both races who had answered similarly.

¶25. The trial court asked whether any such similarly situated jurors had been accepted onto the jury. The defense responded, "I can't find that there are, your Honor."

¶26. The trial court found that Alexander's opposition to the death penalty and her age were sufficient race-neutral reasons and that the defense had failed to show purposeful discrimination with her removal.

### 2. Prospective Juror Number 6 (Esco-Johnson)

---

[2] Question 35 read, "Please describe your feelings about the death penalty in your own words[.]"

Question 36 read, "Please (✓) the one statement that best summarizes your general view about the death penalty":

A._____ I am opposed to capital punishment under any circumstances.

B._____ I am opposed to capital punishment except in a few cases where it may be appropriate.

C._____ I am neither generally opposed to nor in favor of capital punishment.

D._____ I am in favor of capital punishment except in a few cases where it may not be appropriate.

E._____ I am strongly in favor of capital punishment as an appropriate penalty.

10

¶27. Prospective Juror Number 6, Esco-Johnson, was the State's third strike. The State's race-neutral reasons for striking her was her answer to question 35 on the juror questionnaire (she considered the death penalty "wasteful"); she had written a research paper on the cost of the death penalty; she was close in age to Clark; and she had attended the same middle school Clark had attended. Also, the Madison County District Attorney's Office had prosecuted numerous individuals with the last name of Esco. The State submitted a database printout showing all the felony convictions and charges it had on the name Esco in Madison County.

¶28. The defense attempted to rebut two of the reasons offered by the State, arguing that the State never voir dired Esco-Johnson as to whether she was related to any prosecuted Escos. The defense claimed that the State withheld that information to use "strictly for this purpose today[.]" And the defense submitted that regardless of her answer to question 35, she also indicated she was neither opposed to or in favor of the death penalty.

¶29. The State responded that it initially did not have any information on the name Esco, but it later popped up as a prominent name in Canton that the district attorney's office had prosecuted in the past. The State cited *Gaskin v. State*, 873 So. 2d 965, 969-70 (Miss. 2004), which found that a juror with same last name as numerous individuals being prosecuted in the county was a sufficiently race-neutral reason, and *Lockett v. State*, 517 So. 2d 1346, 1353 (Miss. 1987), which said that a "prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory

11

strike, as long as the source of the information and the practice itself are not racially discriminatory."

¶30.    The trial court found that the research Esco-Johnson had conducted on the death penalty and that she shared the same name as numerous individuals who had been prosecuted in Madison County were sufficiently race-neutral reasons. The trial court upheld the State's peremptory strike for Esco-Johnson.

### 3.    Prospective Juror Number 24 (Ammons)

¶31.    Prospective Juror Number 24, Ammons, was the State's fourth strike. The State's race-neutral reasons for striking him were that one of Clark's defense attorneys had previously represented Ammons; he had expressed disagreement with the law that murder during the course of a robbery is capital murder and death-penalty eligible; and he had visited the crime scene.

¶32.    Defense counsel responded that Ammons had indicated during voir dire that he could be fair and impartial to both parties despite defense counsel's prior representation. And although he had visited the store or the crime scene, he stated during corporate voir dire that he could be fair and impartial

¶33.    The trial court found that defense counsel's prior representation of Ammons was a sufficient race-neutral reason. The trial court also found that Ammons's answer to question 41 in the juror questionnaire and that he disagreed with imposition of the death penalty for intentional murder committed during the course of a robbery were sufficient race-neutral

reasons.  Accordingly, the trial court found that defense counsel had failed to establish pretext.

#### 4.      Prospective Juror Number 28 (Majors)

¶34.    Prospective Juror Number 28, Majors, was the State's fifth strike.  The State's race-neutral reasons for striking him was his answer to question 41 indicating that he did not agree with imposition of the death penalty for intentional murder committed during a robbery; his indication during individual voir dire that he had an issue with the death penalty; and his wife's employment with the Mississippi Supreme Court.  Also, the State submitted that Majors was within two years of Clark's age, he had grown up in Canton, and he had attended the same middle school Clark attended.

¶35.    The defense responded that Majors was not voir dired about his wife's employment with the Mississippi Supreme Court, so there was no "information to determine what role, if any, [she] plays in any decision at the Supreme Court."  Defense counsel also argued that many other potential jurors were approximately Clark's age.

¶36.    The trial court accepted the State's reason pertaining to Majors's answer to question 41 in the jury questionnaire.

#### 5.  Prospective Juror Number 46 (Luckett)

¶37.    Prospective Juror Number 46, Luckett, was the State's seventh strike.  The State's race-neutral reasons for striking her were her answers in the juror questionnaire to questions 35, 40,[3] and 41 for which she simply responded "depends on the case" for each question.

---

[3] Question 40 read, "The law provides that to determine if a sentence of death or life imprisonment is appropriate, the jury must consider any aspect of the defendant's life,

13

Also, the State contended that the Madison County District Attorney's Office had prosecuted numerous Lucketts. The State said, "In fact, we have active prosecutions pending right now against several Lucketts." The State then submitted an "AS-400 showing all the felony convictions and charges we have on Lucketts in the Canton area, and also a jail screen printout showing all the arrests of the Lucketts in the Canton area[.]" The State again cited *Gaskin*, 873 So. 2d at 969-70.

¶38.     The defense responded that Luckett had not been voir dired about her relation to any prosecuted Lucketts, nor had the defense been provided with the report to ask her if she was in fact related to any prosecuted Lucketts. The defense also argued that her answer of "depends on the case" is precisely what the law requires. The defense noted that for question 36 on the jury questionnaire, Luckett checked "D," which says, "I am in favor of capital punishment except in a few cases where it may not be appropriate."

¶39.     The State responded that it was not accepting anyone that equivocated on their jury questionnaire or during their individual voir dire about the death penalty. The State contended that Luckett had "expressed reservations" about the death penalty and that she appeared "on the fence." "So based on that and the family name of Luckett and us having pending prosecutions against the Lucketts in Canton where she is from, we would ask that the strike be upheld."

---

character, history and background and any of the circumstances of the offense. This is commonly referred to as mitigating circumstances. How do you feel about considering individual factors about a person's life to make a determination as to what the appropriate sentence should be?"

14

¶40.   The trial court found that while Luckett's reservations about the death penalty had not warranted a challenge for cause, it was nonetheless a sufficient race-neutral reason for the State's peremptory strike. Also, the trial court found as a sufficient race-neutral reason that her last name was the same as that of numerous individuals then being prosecuted by the Madison County District Attorney's Office.

### 6.   Prospective Juror Number 61 (Love)

¶41.   Prospective Juror Number 61, Love, was the State's tenth strike. The State's race-neutral reason for striking him was that his answer to question 35 in his juror questionnaire was, "I personally feel murder is wrong no matter who does it"; his individual voir dire responses indicated that he has a tough time with the death penalty (even though he indicated he thought he could consider it); he indicated in the questionnaire that he had met with the district attorney's office about a shoplifting case which was not pursued; and he had a son close in age to the victim in the case.

¶42.   The defense responded that although Love is "personally against" the death penalty, he responded in the questionnaire that he is neither generally opposed to nor in favor of capital punishment. And he stated that he could follow the law. The defense also argued that Love had not been questioned during voir dire about the shoplifting incident, and he expressed no bad experience with law enforcement during voir dire. The defense submitted that having a son the same age as the victim is "favorable to the State" and should therefore be considered "pretext on the part of the State to exclude Mr. Love because of race."

15

¶43. The trial court found that Love's views toward the death penalty was a sufficiently race-neutral reason. Accordingly, the trial court upheld the State's peremptory challenge.

### 7. Prospective Juror Number 81 (Day)

¶44. Prospective Juror Number 81, Day, was the State's eleventh strike. The State's race-neutral reason for striking her was that, on question 35 in her juror questionnaire, she responded that she would only be in favor of the death penalty if the State had proved a defendant's guilt "beyond a shadow of a doubt." During individual voir dire, she stated that she must have "absolute certainty." The State also cited the fact that two of her children have the last name Luckett, and the prosecution had already shown that its office had prosecuted numerous people in Canton with that last name.

¶45. The defense responded that Day had not been questioned about whether any of her relatives had been prosecuted. As to her questionnaire and individual voir dire response, the defense stated the following:

> As to the questionnaire, Ms. [Day] fit in with the same, generally with a lot of different - - different people of both races who did not understand the system coming into this process and she stated that she could - - that beyond a shadow of a doubt, while it would be her preference, she understood what the law is, what the standard proof is for the State, and she seemed very clear that once she was educated as to that she understood the standard of proof and could abide by that and would abide by that.

¶46. The trial court asked defense counsel, "Do you have any, you said several on the venire, we went through a hundred and something of these folks, so do you have any specific jurors that have actually been accepted where she would fall in the same category relative to

16

her claim of 'shadow of a doubt' or 'absolute proof?'" Defense counsel responded, "Your Honor, I would have to go back through, I don't have that information on hand."

¶47. The trial court found that Day's responses did not rise to the level of a challenge for cause, but the court found that they were sufficiently race neutral for a peremptory challenge. Accordingly, the trial court upheld the State's peremptory strike of Day.

¶48. On appeal, Clark contends that difficulties have arisen in how trial courts have, in practice, proceeded to *Batson*'s third step in considering whether the defendant carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98. Clark contends that the Supreme Court has made clear in subsequent cases since *Batson* that *Batson*'s second step (whether the prosecutor provided race-neutral reasons for the challenged strikes, *id.* at 97-98) was not meant to allow the trial court to finally determine the issue; rather, it was meant to join it and set the parameters for the actual resolution of the question. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1994). Clark argues that *Flowers* instructs that under *Batson*'s third step, the trial court does not merely look back at the reason(s) given for the strike in isolation, but it must determine from the totality of the circumstances demonstrated in the entire record whether the State's actions in striking a disproportionate number of blacks from the jury in a particular case was more likely than not "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2235 (internal quotation marks omitted) (quoting *Foster*, 578 U.S. at 512-13). Clark contends that this Court cannot review the trial court's actions properly without attending to and adopting the analytical requirements of *Flowers*.

17

¶49.   The State argues that *Flowers* did not change the applicable *Batson* analysis.  Rather, *Flowers* found that "the trial court committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not 'motivated in substantial part by discriminatory intent.'" *Flowers*, 139 S. Ct. at 2235 (quoting *Foster*, 578 U.S. at 513).  The *Flowers* Court disagreed with this Court's review of the trial court's comparative-juror analysis and found that prospective juror Wright was similarly situated to white jurors the State did not strike and that other relevant circumstances suggested discriminatory intent.  *Id.* at 2249-51.  But *Flowers* was clear: "we break no new legal ground[,] [but] simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case." *Id.* at 2235.  The State maintains that Clark's case concerns no extraordinary facts and circumstances as was found in **Flowers**, and that the trial court properly found that Clark failed to establish a *Batson* violation.

¶50.   We agree with the State that *Flowers* did not create a new *Batson* standard, as the Court explicitly stated.  *Flowers*, 139 S. Ct. at 2235.  Rather, the Court reaffirmed *Batson*:

> As the *Batson* Court explained and as the Court later reiterated, once a prima facie case of racial discrimination has been established, the prosecutor must provide race-neutral reasons for the strikes. The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties.

*Id.* at 2243; *see also* **Brawner v. State**, 872 So. 2d 1, 11 (2004) (analysis under *Batson*'s third step requires a determination, under the totality of the circumstances, whether the race-neutral reasons offered were mere pretexts for unlawful discrimination (quoting **Hughes v. State**, 735 So. 2d 238, 252 (Miss. 1999))).

18

¶51. As noted above, *Flowers* provided examples of evidence that a defendant may present "to support a claim that a prosecutor's peremptory strikes were made on the basis of race":

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers*, 139 S. Ct. at 2243 (citing *Foster*, 578 U.S. 488; *Snyder*, 552 U.S. 472; *Miller-El II*, 545 U.S. 231).

¶52. This Court has provided similar examples:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; . . . (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Corrothers v. State*, 148 So. 3d 278, 305 (Miss. 2014) (quoting *Flowers v. State*, 947 So. 2d 910, 917 ( Miss. 2007)).

¶53. *Flowers* reiterated that, "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Flowers*, 139 S. Ct. at 2244 (internal quotation

marks omitted) (quoting *Batson*, 476 U.S. at 98 n.21); *see also Davis v. State*, 76 So. 3d 659, 661 (Miss. 2011) (demeanor of the prosecutor will often be "the best evidence of discriminatory intent" (citing *Snyder*, 552 U.S. at 477)).  As in most instances involving factual determinations by the trial court, a "highly deferential" standard of review is employed for "factual determinations in a *Batson* hearing[.]"  *Flowers*, 139 S. Ct. at 2244 (internal quotations mark omitted) (quoting *Snyder*, 552 U.S. at 479).  And "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Id.* (internal quotation mark omitted) (quoting *Snyder*, 552 U.S. at 477); *see also Pitchford v. State*, 45 So. 3d 216, 226 (Miss. 2010) (same).

¶54.   This Court has said that in "proving that the striking party exercised its peremptory challenges in a discriminatory manner, the complaining party may employ a comparative analysis of minority and non-minority jurors to show disparate treatment."  *Magee v. State*, 720 So. 2d 186, 189 (Miss. 1998) (citing *Young v. State*, 848 S.W.2d 203, 205-06 (Tex. Ct. App. 1992)).  But we have also instructed that rebuttal evidence and arguments not presented to the trial court will not be considered on appeal.  *Pitchford*, 45 So. 3d at 227-28 n.17 (while a trial court must look to the totality of the facts and circumstances, those facts and circumstances do not include arguments not presented to the trial court).

¶55.   We do not agree with Clark or the dissent that the Supreme Court has mandated or suggested that trial courts or reviewing courts are required to conduct a comparative juror analysis when the defendant has not requested one.  The United States Court of Appeals for

20

the Fifth Circuit recently spoke to this in *Ramey v. Lumpkin*, 7 F.4th 271 (5th Cir. 2021),

*cert denied*, 142 S. Ct. 1442 (2022) (mem):

> Although the Supreme Court in *Miller-El II* conducted a comparative juror
> analysis for the first time on appeal, 545 U.S. at 241 n.1 & 2, 125 S. Ct. 2317,
> and the Court did the same in *Flowers*, albeit in a case beyond the strictures
> of AEDPA, 139 S. Ct. at 2249-50, it is not clearly established that habeas
> courts must, of their own accord, uncover and resolve all facts and
> circumstances that may bear on whether a peremptory strike was racially
> motivated when the strike's challenger has not identified those facts and
> circumstances. Indeed, in *Chamberlin v. Fisher*, this court sitting en banc
> held that "*Miller-El II* did not clearly establish any requirement that a state
> court conduct a comparative juror analysis at all, let alone *sua sponte*."
> [*Chamberlin v. Fisher*, 885 F.3d 832, 838 (5th Cir. 2018)]. "This is especially
> true where, as here, the defendant never sought a comparative juror analysis."
> *Id.* at 839. *Chamberlin* reversed the district court for embracing the rule that
> a state habeas court's "decision not to conduct a comparative juror analysis *sua
> sponte* violated . . . 'clearly established law.'" *Id.* at 838.

*Ramey*, 7 F.4th at 280-81; *see also* ***Chamberlin***, 885 F.3d at 841-42.

¶56.    We agree with the Fifth Circuit.  There is no established requirement that a trial court

must conduct a comparative juror analysis when one is not requested, and there is no

requirement that a reviewing court must conduct one for the first time on appeal.

¶57.    As the Fifth Circuit has cautioned, "retrospective comparison of jurors based on a cold

appellate record may be very misleading when alleged similarities were not raised at trial."

***Chamberlin***, 885 F.3d at 841 (quoting ***Snyder***, 552 U.S. at 483).  Thus, "an appellate court

must be mindful that an exploration of the alleged similarities at the time of trial might have

shown that the jurors in question were not really comparable."  *Id.* at 841-42. (internal

quotation mark omitted) (quoting ***Snyder***, 552 U.S. at 483).[4]

---

    [4] ***Snyder*** conducted a limited comparison analysis on a "shared characteristic" that
"was thoroughly explored by the trial court" regarding concerns voiced by certain

¶58. Here, Clark goes to great lengths with a comparative juror analysis for the first time on appeal. He advances it with the contention that *Flowers* requires that it be considered on appeal under the above-mentioned *Flowers* examples, which Clark submits "must be taken into account." We read no such mandate from the Supreme Court's decision. *Flowers* reiterates examples of factors that "defendants *may* present" to the trial court in support of the claim that a peremptory strike was racially motivated. *Flowers*, 139 S. Ct. at 2243 (emphasis added).

¶59. Clark also endeavors to place this case on par with *Flowers*, submitting that there is "evidence of a fairly recent history of similar behavior on the part of the office prosecuting this case, and of a race-based reason for having as white a jury as possible seated given how the State presented and argued its evidence in this case." And he submits that the trial court's *Batson* errors were "at the very least encouraged by this Court's constitutionally erroneous view– repudiated by [*Flowers*] subsequent to the trial in the instant matter– that even at th[e] final stage of [*Batson*] analysis trial courts only had to 'look at the challenged strike in isolation' rather than looking at it 'in the context of all the facts and circumstances.'" (quoting *Flowers*, 139 S. Ct. at 2250). Clark argues that "this Court's persistence in this erroneous approach [has] made a mess that led the trial court to err[,]" and this Court may

---

prospective jurors "about serving on the jury due to conflicting obligations[.]" *Snyder*, 552 U.S. at 483. *Snyder* held that the trial court had clearly erred by rejecting the defendant's *Batson* objection to a black prospective juror who was peremptorily struck based on his disclosure that the trial might interfere with his student-teaching obligations. *Id.* at 482-85. *Snyder* found that "[t]he implausibility of [the prosecutor's] explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious . . . ." *Id.* at 483 (stressing that one specific comparison was "particularly striking").

22

"clean it up" in one of two ways: either find that the trial court used an improper legal standard or conclude that the trial court was clearly erroneous as the Supreme Court found the trial court was in **Flowers**.

¶60. Once again, Clark over-reads **Flowers**. As the Supreme Court stated at the outset of its opinion: "[W]e break no new legal ground. We simply enforce and reinforce **Batson** by applying it to the *extraordinary facts* of this case." **Flowers**, 139 S. Ct. at 2235 (emphasis added).

¶61. In **Flowers**, the same prosecutor subjected the defendant to six successive trials for the same murders. This Court reversed one of those trials based on **Batson** violations. **Flowers v. State**, 947 So. 2d 910, 939 (Miss. 2007). We rejected Flowers's **Batson** claims on direct appeal from the sixth trial. **Flowers**, 240 So. 3d at 1135. While recognizing the historical evidence of past discrimination presented by defense counsel to the trial court in support of his **Batson** claims, we ultimately deferred to the trial court's factual findings. **Id.** at 1124.

¶62. On certiorari, the Supreme Court reversed this Court, finding that "[f]our critical facts, taken together, require[d] reversal." **Flowers**, 139 S. Ct. at 2235. First, in the six trials combined, the prosecutor struck forty-one of forty-two black prospective jurors. **Id.** Second, the prosecutor struck five of six black prospective jurors in the sixth trial. **Id.** Third, the prosecutor engaged in dramatically disparate questioning of black and white prospective jurors. **Id.** Fourth, the prosecutor struck a black prospective juror who was similarly situated to white prospective jurors not struck. **Id.** The Court reiterated in its conclusion:

23

[W]e need not and do not decide that any one of these four facts alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court at Flowers' sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not motivated in substantial part by discriminatory intent. In reaching that conclusion, we break no new legal ground. We simply enforce and reinforce ***Batson*** by applying it to the extraordinary facts of this case.

*Id.* at 2251.

¶63. The case before us is not ***Flowers***. *See, e.g.*, ***Flowers***, 139 S. Ct. at 2251 (Alito, J., concurring) ("As the Court takes pain to note, this is a highly unusual case. Indeed, it is likely one of a kind."). And we reiterate that consistent with ***Pitchford***, and absent exceptional circumstances, we will not consider, on direct appeal, rebuttal evidence and arguments that were not presented to the trial court.

¶64. We have thoroughly reviewed this record. The types of exceptional circumstances or extraordinary facts found in ***Foster***, ***Miller-El II***, or ***Flowers*** are not present here as to warrant a comparative juror analysis for the first time on appeal. Having reviewed this record, what we do notice is what ***Snyder*** cautioned against: "that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." ***Snyder***, 552 U.S. at 483. Therefore, we will address what was properly presented to the trial court, while responding to the dissent's contentions accordingly.

### 1. Prospective Juror Number 2 (Alexander)

¶65. Again, the only pretext argument the defense submitted against Alexander's strike was that even though she indicated in her jury questionnaire that she was against the death penalty under any circumstances, there were prospective jurors of both races who had answered

24

similarly. The defense, however, did not produce any such evidence upon request from the trial court. "In the absence of an actual proffer of evidence by the defendant to rebut the State's neutral explanations, this Court may not reverse on this point." *Sudduth v. State*, 562 So. 2d 67, 71 (Miss. 1990) (citing *Davis v. State*, 551 So. 2d 165, 172 (Miss. 1989)). Further, this Court has held that "a juror's views on the death penalty are a race-neutral reason for a strike." *Batiste v. State*, 121 So. 3d 808, 849 (Miss. 2013) (citing *Pitchford*, 45 So. 3d at 228-29). Accordingly, we affirm the trial court's conclusion that the State's peremptory strike against Alexander was not motivated by discriminatory intent.

### 2. Prospective Juror Number 6 (Esco-Johnson)

¶66. The trial court accepted the State's race-neutral reasons for wanting to strike Esco-Johnson based on the fact she had written a research paper on the death penalty and because she believes it is wasteful because it costs more to impose than a life sentence. The trial court also found the fact that she shares the same last name as numerous individuals who have been prosecuted in Madison County was a sufficient race-neutral reason submitted by the State.

¶67. As this Court has held, a juror that shares the same last name as numerous individuals that have been prosecuted in the county where the trial is taking place is a sufficient race-neutral reason for removal. *Gaskin*, 873 So. 2d at 969-70. We have also said that "the prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long as the source of the information and the practice itself are not racially discriminatory." *Lockett*, 517 So. 2d at

25

1353. During the ***Batson*** hearing, the State submitted a database printout showing all the felony convictions and charges Madison County had on the name Esco.

¶68.    We cannot say that this source of information or that the State's use of that information was racially discriminatory.  Nor can we say that Esco-Johnson's  expressed views about the death penalty as basis for the State's other reason for wanting to strike her was racially discriminatory.  ***Batiste***, 121 So. 3d at 849.  Accordingly, we find that the trial court's ruling allowing the State to strike Esco-Johnson was not clearly erroneous.

¶69.    Presiding Justice King's dissent contends that side-by-side comparisons show that similarly situated white jurors were accepted by the State.  The dissent submits for example that the State accepted Prospective Juror Number 17 (James), despite his stepson's multiple prosecutions in Madison County; and the State accepted Prospective Juror Number 34 (McFarland), despite his having had a family member arrested in Madison County.  The State also accepted Prospective Juror Number 62 (Henley), who, according to the dissent, "also indicated a concern with taxpayer dollars."  King Diss. Op. ¶ 316.

¶70.    The record illustrates, however, that these three jurors are not much comparable with Esco-Johnson.   While James disclosed that he had a family member with multiple prosecutions in Madison County, James also indicated that he is strongly in favor of capital punishment due to the murder of his grandfather under circumstances similar to the case here. And he would vote for the death penalty in every case where the law allows it.  McFarland, who indicated that he had a family member who was charged with disorderly conduct in the city of Madison in 1990, wrote for question 35 in his juror questionnaire that he agrees with

the death penalty. And he indicated that he is strongly in favor of capital punishment as an appropriate penalty. Henley indicated that she is in favor of capital punishment except in a few cases where it may not be appropriate, whereas Esco-Johnson indicated that she is neither generally opposed to nor in favor of capital punishment. In expressing her views about the death penalty, Henley wrote that "if we are going to have death as a punishment, I think the accused should die in the same way they killed their victims." And she wrote that "I also don't want to pay (my hard earned money) for violent criminals to live in overcrowded prisons, so death penalty is used."

¶71. Presiding Justice King's dissent contends that we are comparing apples to oranges, asserting that white jurors whose close relatives had significant involvement in the criminal justice system were in favor of capital punishment and that the State did not give any opposition to capital punishment as a reason for striking Esco-Johnson. The dissent says that we are now comparing jurors based on reasons not even suggested or given by the State or considered by the trial court.

¶72. We are not. The State had a problem with the fact that Esco-Johnson had written a research paper on the death penalty and had concluded that the death penalty is wasteful. The trial court accepted this fact as a race-neutral reason "based upon that type of research and knowledge and concerns relative to the death penalty." Clark claims that Esco-Johnson is similarly situated to James and McFarland, who both disclosed they had relatives who were previously prosecuted in Madison County, and to Henley, who commented on the feasibility of the death penalty in her juror questionnaire.

¶73. The above mentioned comparisons only illustrate evidence bearing on the State's proffered reasons for wanting to strike Esco-Johnson. We are not submitting entirely different or substituted reasons for the State's strikes. The fact that James and McFarland indicated that they are strong proponents of the death penalty is evidence that they do not have the same concerns as Esco-Johnson about the death penalty. And Henley's disclosures suggest that she believes the death penalty is more feasible than life without parole sentences. The above mentioned comparisons illustrate what the State may have fairly presented had Clark made his similarly situated claims in the trial court.

¶74. The Fifth Circuit explained in **Chamberlin** as follows:

> First, the district court took out of context the **Miller-El II** admonition that "a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." **Miller-El II**, 545 U.S. at 252, 125 S. Ct. 2317. The Court was careful to limit its warning only to the prosecutor's "reason[s] for striking [a] juror" at the second prong of the **Batson** test. **Id.** at 251, 125 S. Ct. 2317 (emphasis added). This narrow focus is essential to maintaining the integrity of the **Batson** framework, which requires a focus on the actual, contemporary reasons articulated for the prosecutor's decision to strike a prospective juror. The timely expressed neutral reasons, after all, are what must be tested for veracity by the trial court and later reviewing courts. And this is what the Supreme Court meant in stating the "stand or fall" proposition: it criticized both the prosecutor and later reviewing courts for accepting either entirely different substituted reasons or post hoc reasons for strikes. The Court's rationale, however, does not extend to preventing the prosecution from later supporting its originally proffered reasons with additional record evidence, especially if a defendant is allowed to raise objections to juror selection years after a conviction and to allege newly discovered comparisons to other prospective jurors. Nothing in the "stand or fall" statement means that the prosecutor would forfeit the opportunity to respond to such contentions.
>
> In addition, the Court specifically noted that when a prosecutor gives a facially race-neutral reason for striking a black juror, a reviewing court must "assess the plausibility of that reason in light of all evidence with a bearing on it." **Id.**

28

at 251–52, 125 S.Ct. 2317 (emphasis added); *see also* **Snyder v. Louisiana**, 552 U.S. 472, 483, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008)

**Chamberlin**, 885 F.3d at 841.

### 3. Prospective Juror Number 24 (Ammons)

¶75. The trial court found that defense counsel's prior representation of Ammons was a sufficient race-neutral reason for the State's strike. The court also found that Ammons's response to question 41 in the juror questionnaire that he disagreed with imposition of the death penalty for intentional murder committed during a robbery was a sufficient race-neutral reason.

¶76. The fact that defense counsel had previously represented Ammons in another matter was certainly a sufficient race-neutral reason for the State's wanting to remove him. And the fact that he indicated disagreement with Mississippi law allowing imposition of the death penalty for intentional murder committed during the course of a robbery is also sufficient race-neutral reason. Accordingly, we find no clear error in the trial court's decision to allow the State's peremptory strike against Ammons.

### 4. Prospective Juror Number 28 (Majors)

¶77. The trial court upheld the State's peremptory strike against Majors based on his response to question 41 in the juror questionnaire. For reasons just mentioned with respect Majors, we find no clear error in the trial court's decision. Further, defense counsel did not respond to this race-neutral reason given by the State. Defense counsel only argued that the State did not voir dire Majors with regard to his "spouse being a paralegal at the Supreme Court."

¶78. The dissent contends that even though Majors answered no to question 41, he evinced during individual voir dire a clear agreement with what the question asked, that an intentional killing may be punished by the death penalty. The dissent contends that the State took great pains to clarify that some of the answers white jurors gave on questionnaires were given before they came to court and before they fully understood what the law was. But the State asked no such questions of Majors, which the dissent submits demonstrates disparate questioning. The dissent further contends that the State's assertion that Majors expressed an "issue" with the death penalty during individual voir dire is not supported by the record. King Diss. Op. ¶ 322 (internal quotation marks omitted).

¶79. As the dissent acknowledges, with the exception of Prospective Juror Number 20 (Houston), who put a question mark for question 41, each of the prospective jurors compared by the dissent answered yes to question 41. While Majors did indicate during individual voir dire that he could follow the law, he nonetheless answered no on his juror questionnaire as to whether he agreed with Mississippi law. This is different from someone who indicated that they did not understand the question.

¶80. As to the contention that the State misrepresented the record by telling the trial court that Majors expressed an issue with the death penalty during individual voir dire, this was not presented to the trial court. And we do not have the confidence to reach the same conclusion reached by the dissent based on our review of the record. Again, while Majors indicated during individual voir dire that he could follow the law, there were also instances in which his responses arguably could give the State some pause. When asked by the State

30

about his response to the question 41, Majors responded: "My personal belief, I guess - - my personal belief is if a murder was - - depending on how the murder was, if it was - - I'm just go[ing to] break it down. If it was something like, you know, someone cutting somebody['s] head off or something, anything like that, yes, I believe that - - I believe in the death penalty. But if it was something like, you know, accidental or something like that, no." When the State followed up, asking Majors specifically about why he answered no as to whether he agreed with Mississippi law, Majors responded: "Still, depending on, you know, if it still could have been accidental, you know, just in a robbery. Run in. Boom. I didn't mean to do that. No, I don't. I don't believe that the death penalty - - well, no. No, I don't think so." At the very least, it could reasonably be argued that these particular responses by Majors lent themselves to some ambiguity, which the trial court ultimately would have had to resolve.

5.      **Prospective Juror Number 46 (Luckett)**

¶81.    The State submitted that Luckett's responses to questions 35, 40, and 41, for which she responded, "depends on the case" for each question, indicated that she had reservations about the death penalty. The State told the trial court that it was not accepting anyone that equivocates in their questionnaire or individual voir dire about the death penalty. The State also entered into evidence a database printout showing numerous individuals in Canton with the same last name as Luckett who have felony convictions and charges.

¶82.    The trial court found that Luckett's reservations about the death penalty and the fact that she shares the same last name as numerous individuals that had been or were being

31

prosecuted by the Madison County District Attorney's Office were sufficient race-neutral reasons.

¶83. We find no clear error with the trial court's decision. Again, the fact that Luckett shares the last name with numerous individuals prosecuted in the county is a race-neutral reason. *Gaskin*, 873 So. 2d at 969-70. Also, we have said that noncommittal responses to the death penalty are sufficient race-neutral reasons for a peremptory strike. *Johnson v. State*, 529 So. 2d 577, 585 (Miss. 1988).

¶84. Both in her juror questionnaire, and during individual voir dire, Luckett repeatedly responded with either "it depends" or simply by nodding her head affirmatively, as described by the transcript. The dissent compares Luckett to a number of white prospective jurors who stated that imposition of the death penalty would depend on the circumstances. The dissent contends that based upon his statements during individual voir dire, the State admitted that Meek was equivocating on the death penalty. According to the dissent, the State noted to Meek regarding the death penalty that "you're hesitating a little" and that "[y]ou're kind of middle of the road[.]"

¶85. The dissent contends that during Prospective Juror Number 74 (Biddle's) individual voir dire when the State asked if the death penalty was appropriate when someone is killed during the course of a robbery, Biddle responded "[d]epending on what was going on it could be." King Diss. Op. ¶ 325 (internal quotation marks omitted). Biddle also indicated that the death penalty may be appropriate if a crime "was especially violent[,]" and she noted that "If the circumstances warranted it, I would do it if I had to."

¶86. The dissent contends that during his individual voir dire, Prospective Juror Number 78 (Schommer), stated, "I think it depends on the case. I don't feel strongly one way or the other." King Diss. Op. ¶ 329 (internal quotation marks omitted).

¶87. And during her voir dire, Prospective Juror Number 83 (Green), when the trial court asked if she had any conscientious scruples in applying the death penalty, responded, "I think it depends on the case. I don't feel strongly one way or the other."

¶88. Lastly, the dissent contends that Prospective Juror Number 91 (Hensarling) responded to question 35 in her juror questionnaire similar to how Luckett responded by stating that, "It depends on the case - crime[.]" And she indicated that she is "neither generally opposed to nor in favor of capital punishment." King Diss. Op. ¶ 329 (internal quotation marks omitted).

¶89. We do not see the same similarities as the dissent, or at least nothing so striking as to give cause for concern. While Prospective Juror Number 37 (Meek) expressed reservations about the death penalty, he elucidated his opinion about the death penalty. In describing his feelings about the death penalty for question 35 in his juror questionnaire, Meek stated:

> I want to be a part of a society that values and protects innocent life. Since evil exists in the world and is sometimes acted out on innocent people, capital punishment is a necessary option for the governing authorities to have. Romans 13:4 says[,] . . . if you do wrong, be afraid, for rulers do not bear the sword for no reason." Christians are being told to respect authority in these verses. It is not something to be done hastily but rather should only be an option for extremely heinous cases.

¶90. For question 41, Meek indicated that he agrees with Mississippi law. He explained that "We need laws that allow for punishment [and] consequences commensurate with the crime."

¶91. For question 35, Biddle described her feelings about the death penalty, stating that "I am in favor of following the law. If it is appropriate in the case, then I am not opposed." For question 41, Biddle indicated that she agrees with Mississippi law. During individual voir dire, while Biddle would sometimes nod her head (as did many jurors) in response to questions, she also provided confirming yes and no responses to questions from the State and the defense.

¶92. Prospective Juror Number 78 (Schommer) indicated yes for question 41. He explained in his questionnaire why he agreed with law, stating that "If you are protecting yourself and your family, then it could be justified and no need to impose the death penalty. If the robber murders someone, then I do not have a problem with the death penalty." Throughout individual voir dire Schommer provided full comprehensive responses to questions from the State and the defense.

¶93. For question 35, Green stated that "I am more for a life sentence as opposed to the death penalty, but I believe that there are certain cases and circumstances where the death penalty is appropriate." For question 41, she indicated that she agrees with Mississippi law. She explained that "I agree with this law in which the death penalty would be an option, but I do not think it is appropriate in all cases." During individual voir dire, Green provided clear yes and no responses to questions asked by the State and the defense.

34

¶94. For question 41, Hensarling indicated that she agrees with Mississppi law. She explained, "I believe if the death penalty is appropriate, so be it."

### 6. Prospective Juror Number 61 (Love)

¶95. The trial court found that Love's expressed view that the death penalty is the same as murder was a sufficient race-neutral reason for the State's peremptory strike.

¶96. Clark argues on appeal that although Love indicated in his juror questionnaire that he was "neither generally opposed to the nor in favor of the capital punishment," he consistently affirmed during individual voir dire that he understood and agreed with the law permitting it as a punishment.

¶97. Based on our review of Love's individual voir dire, he did not plainly confirm that he used the term "murder" interchangeably with killing for question 35 in stating his personal views about the death penalty. And we do not find his responses comparable to Meek, Biddle, or Henley as the dissent contends. When asked by trial court if he had any conscientious scruples against the death penalty, Love stated: "Well, like I put in my questionnaire, personally, I'm against, you know, murder of any type, but I understand it's the law." And he stated that, "I personally don't believe in murder[,]" when asked by the State if he was personally opposed to the death penalty. He also answered affirmatively when asked if a jury's sentence of death classifies as murder. Though we agree with Clark that Love stated a number of times that he could follow the law and consider the death penalty, he also equivocated at other points when asked directly if he could sentence an

individual to death. "A juror's stance against the death penalty is a valid race-neutral reason for a strike." **Corrothers**, 148 So. 3d at 309 (citing **Pitchford**, 45 So. 3d at 228-29).

¶98. Accordingly, we find no clear error with the trial court's decision to allow the State's peremptory strike against Love.

### 7. Prospective Juror Number 81 (Day)

¶99. The State sought to strike Day based on her response to question 35 in which she stated that she is in favor of capital punishment only when guilt is proved "beyond a shadow of a doubt[.]" Also, she stated during individual voir dire that she must have "absolute certainty." The trial court found that her responses were sufficient race-neutral reasons for the State's peremptory challenge.

¶100. Clark argues that Day's response to question 35, in which she stated that she would require a proof "beyond a shadow of doubt" before imposing the death penalty was written well before trial court's explanation during corporate voir dire about the "beyond a reasonable doubt" standard. And she later stated during individual voir dire that she would follow the correct standard.

¶101. According to individual voir dire, the State questioned Day about her statement to question 35 in her juror questionnaire. When asked if she "would have to know for certain that something happened before you could, as a juror, in good faith impose the death penalty[,]" Day responded, "That would be my preference." The State subsequently asked, "Because this is a death penalty case and because death is a very real option in this case, do

36

you have to know for certain, beyond a shadow of a doubt, with absolute certainty, that the Defendant is guilty of capital murder?" Day responded yes.

¶102. When defense questioned her, Day said that she understood that the State's burden of proof would be beyond a reasonable doubt, not beyond a shadow of a doubt. Defense counsel also questioned Day about when the prosecutor asked the venire members during corporate voir dire that since this is a death penalty case, "if those in the audience who believed that . . . , the State, must be held to a higher burden of proof[,]" and the fact that she did not raise her hand. Day said, "the reason I didn't raise my hand when Mr. Guest asked the other day was because as he explained it I understood and I knew that I could make a decision beyond a reasonable doubt - - with reasonable doubt and not a shadow of a doubt. So it was my choice of words in filling out the questionnaire."

¶103. The trial court also questioned Day as follows:

> THE COURT: And if you will recall, I said that I can't tell you what a reasonable doubt is, but I can tell you what it is not. It's not beyond a shadow of a doubt and it's not beyond all doubt. It's beyond a reasonable doubt and that's up to y'all to decide what constitutes a reasonable doubt.
>
> PROSPECTIVE JUROR: Uh-huh. (Affirmative response.)
>
> THE COURT: But when I told you that, it was after you had already filled out this questionnaire, right?
>
> PROSPECTIVE JUROR: Correct.
>
> THE COURT: And so what you just told Mr. LaBarre is that since you've been through this process you now understand that and will apply the reasonable doubt standard and not some greater standard.
>
> PROSPECTIVE JUROR: That's correct.

37

¶104. We do not find discriminatory intent behind State's proffered reason for wanting to strike Day based on her questionnaire and voir dire responses. As the State points out on appeal, while Day stated that she did not know what the actual standard of proof was for the State when she filled out her questionnaire, she admittedly learned it during corporate voir dire when the trial court explained it. Yet, when the State subsequently questioned her about it during individual voir dire, she again indicated that she would still require a higher standard of proof in order to impose the death penalty.

¶105. We find that the inconsistency shown with regard to the standard of proof Day would require in a death penalty case supports the State's race-neutral reason for wanting to strike her. Accordingly, we find no error with the trial court's decision to allow it.

¶106. Based on the evidence and the arguments presented to the trial court during the **Batson** hearings, we find that the trial court did not err by denying Clark's **Batson** challenges. Accordingly, we find no merit to Clark's **Batson** claims on appeal.

> **B.** **The trial court violated the Constitution by striking, over Clark's objection, three prospective jurors eligible to serve in this case, and by refusing to strike for cause four prospective jurors disqualified from being fair and impartial jurors as to sentence, one of whom served as a trial juror.**

¶107. Clark claims the trial court erroneously excluded for cause Prospective Juror Number 7 (Piro), Prospective Juror Number 73 (Moore), and Prospective Juror Number 99 (Shepherd); but, Clark continues, all only indicated scruples against the death penalty and were not disqualified under **Witherspoon v. Illinois**, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), and **Wainwright v. Witt**, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841

38

(1985). Clark also claims the trial court erred by denying his challenge for cause against Prospective Juror Number 3 (Scruggs), Prospective Juror Number 8 (Powell), Prospective Juror Number 17 (James), and Prospective Juror Number 41 (Sistrunk), who he claims were all disqualified under *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), for their inability to consider mitigating evidence or impose any sentences less than death.

¶108. The State contends that the record supports the trial court's decision to remove Piro, Moore, and Shepherd because each made clear that their views of the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with the court's instructions and their oaths. The State contends that Clark's *Morgan* claims are barred because he used peremptory strikes to remove James, Scruggs, and Powell. And he had not exhausted his peremptory challenges when Sistrunk was seated as a juror.

¶109. The trial court has wide discretion in determining whether to excuse potential jurors for cause. *Ambrose v. State*, 254 So. 3d 77, 123 (Miss. 2018) (citing *Batiste*, 121 So. 3d at 850). This Court will not disturb that decision unless we find the trial court abused its discretion. *Id.*

> **1. Three prospective jurors qualified under *Witherspoon v. Illinois* to sit as jurors in this case were improperly excused over Defendant's objections.**

¶110. The Due Process Clause of the Fourteenth Amendment and the Sixth Amendment's guarantee of an impartial jury prohibit the death penalty "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced

39

general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522.[5] In determining when a prospective juror may be excluded for cause because of his or her views on the death penalty, the proper standard "is whether the juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Wilcher v. State*, 863 So. 2d 776, 813-14 (Miss. 2003) (alteration in original) (internal quotation marks omitted) (quoting *Wainwright*, 469 U.S. at 424).

¶111. "[T]his standard . . . does not require that a juror's bias be proved with unmistakable clarity." *Wainwright*, 469 U.S. at 424 (clarifying the standard set forth in *Witherspoon*). Many prospective jurors "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear[.]'" *Id.* at 424-25. A prospective juror "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Id.* at 425. Thus, "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426 ("Despite [a] lack of clarity in the printed record, . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."). This deferential standard by reviewing courts remains true "regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias." *White v. Wheeler*,

---

[5] *Witherspoon* was decided two weeks after the Court in *Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968), held that the Sixth Amendment's jury trial guarantee was binding on the states.

577 U.S. 73, 77, 136 S. Ct. 456, 193 L. Ed. 2d 384 (2015) (internal quotation marks omitted) (quoting *Uttecht v. Brown*, 551 U.S. 1, 7, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007)).

### a. Prospective Juror Number 7 (Piro)

¶112. Piro, a licensed Mississippi attorney, stated in her juror questionnaire that, "In general, the death penalty is in conflict with my religious principles." For question 36 in the questionnaire, she marked the option, "I am opposed to capital punishment except in a few cases where it may be appropriate."

¶113. During individual voir dire, Piro stated that her religious beliefs caused her to "have a hard time with the issue of the death penalty." She stated though that, as a member of the bar, she understood her responsibilities "as far as carrying out the law and doing my role as a juror."

¶114. When questioned about her religious beliefs about the death penalty, Piro responded, "When I'm asked -- it's a very difficult issue for anybody to be able to respond to. I value life. And if I were given two options, I probably would choose a life sentence versus a capital sentence, death penalty sentence." If given the option between these sentences, Piro said that "as a gut reaction," she "would lean more toward life as opposed to death."

¶115. When asked if the evidence demonstrated that death was an appropriate sentence, whether she could vote for that sentence, Piro responded, "[I]t would be very weighty on my heart. I'll be honest with you about that. . . . It's not something I would like to live with for the rest of my life. But I understand if I were selected as a juror it is a decision that I would have to carry out."

41

¶116. Piro acknowledged that she was experiencing "a high level of emotions" on the prospect of having to consider imposing the death penalty. When asked if her views on the death penalty would substantially impair her ability to serve as a juror, she responded, "I don't think they would substantially impair my ability." After again stating that it would be difficult for her to vote for the death penalty, Piro was asked if she could vote for the death penalty knowing that "if you give it, it's to be carried out." Piro responded as follows:

> Not knowing the full extent of the particular facts and circumstances, my general thought would be a life sentence if that were the case. . . . [I]t's just -- I mean, any -- for any human to make a choice, it's a very weighty choice and the alternative would be my choice if I were placed in that position.

¶117. In response to defense counsel's questions during voir dire, Piro affirmed that the death penalty is in conflict with her religious beliefs. She stated though that she could consider both sentencing options. In reference to her stated ability to vote for the death penalty, defense counsel asked, "You wouldn't have any problem with that?" Piro responded, "I wouldn't say I wouldn't have any problem with it."

¶118. The trial court then questioned Piro about her ability and willingness to consider aggravating and mitigating circumstances during sentencing:

> THE COURT: Now if you believed that the mitigating circumstances outweigh the aggravating circumstances, would you be able to return a sentence of life imprisonment?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: But now if you believed that the aggravating circumstances outweighed the mitigating circumstances, would you be willing to return a verdict of death?
>
> PROSPECTIVE JUROR: That's a hard answer for me, sir.

42

THE COURT:  That's why I'm asking it.

PROSPECTIVE JUROR:  I -- I know it is.

THE COURT:  So what I've got to know is, as you sit here today, if you're telling me that under no circumstance would you be able to impose a sentence of death, then you probably don't need to be on the jury.

PROSPECTIVE JUROR:  I understand.

THE COURT: On the other hand, if you're telling me that death is the only sentence that you would consider and you'd never give life without parole, then you shouldn't sit on the jury.

PROSPECTIVE JUROR:  Right.

THE COURT:  It's only when you have the ability and the willingness to consider both of those are you a proper juror in this case.

PROSPECTIVE JUROR:  Honestly, I think it's a very difficult choice to be placed in, and I understand what -- what you're asking me. I think I would be -- I think life a sentence would be the -- the choice if I were placed in that position. I would have extreme difficulty to making a choice to –

THE COURT:  So regardless of what -- the evidence that may be presented and what the instructions of the Court may say, what you're telling me is that more likely than not you would go with a life sentence --

PROSPECTIVE JUROR:  Yes.

THE COURT -- irrespective of what the factors are?

PROSPECTIVE JUROR:  Right. I am not going to endure [sic] any instructions that I would receive as a juror.  But I'm just telling you that my -- my ability to choose a -- a -- a death sentence for someone[,] I'm not certain that I could carry that out.

¶119. Finding that Piro's views on the death penalty "would substantially impair the performance of her duties and instructions in following her oath," the trial court granted the

State's challenge for cause. The trial court found that although Piro had stated at times she had the ability to consider both sentencing options,

> she really didn't want to say that she would -- could return a verdict of death. In fact, she seemed to me, with all of her mannerisms, to really say that that's just not something she could do and so I'm left with the impression that she'd be unable to faithfully and impartially apply the law because of her views on the death penalty.

¶120. We find no abuse of discretion in the trial court's decision. Even though Piro stated at times that she could consider the death penalty as a sentencing option, she also expressly indicated that she simply did not know how she would react when faced with imposing a death sentence. She became emotional at even having to consider the prospect, and when questioned by the trial court, she forthrightly admitted that she was not certain she had the ability to choose the death penalty if the evidence warranted it.

### b.    Prospective Juror Number 73 (Moore)

¶121. Moore did not answer questions 35, 40, and 41 on her jury questionnaire, which respectively asked prospective jurors to describe their feelings about the death penalty, determining the appropriate sentence in a death penalty case, and whether they agreed with the law that provides the death penalty as an available option for murder committed during the course of a robbery. Moore indicated in the questionnaire her opposition to the death penalty "except in a few cases where it may be appropriate" and that she was "opposed to the death penalty but could vote to give it in a proper case."

¶122. During individual voir dire, Moore stated that she was "not a fan of" the death penalty, but she could consider the evidence and the law in reaching her sentencing decision. She

44

indicated a preference of a life-without-parole sentence over a sentence of death. When asked about portions of her questionnaire left blank, Moore responded, "I didn't know what to put. It's hard to just write it down, your feelings for something like that."

¶123. When asked about leaving blank the question that asked if she agreed with the law that the death penalty may be imposed in a capital murder/robbery case, Moore stated that she left that item blank, "probably not on purpose. Probably more on accident."

¶124. Moore twice did not respond when asked by the State if she could vote for the death penalty. Moore eventually indicated that she did not think she could sit on a death penalty case and "vote to execute another human being." But when asked this question again by the State, Moore then indicated that her views would not prevent or substantially impair her from being able to sit as a juror on this death-penalty case.

¶125. At this point in the State's questioning, Moore appeared confused about whether they were talking about the guilt phase of the capital trial, as shown by the following exchange:

> PROSPECTIVE JUROR: I guess thinking, like, long term, you know, at the end part. Of course, it's still the first phase of the guilty or innocent.
>
> MR. BRAMLETT: We're past that.
>
> PROSPECTIVE JUROR: So this is just the death penalty part?
>
> MR. BRAMLETT: Yeah. This is - - that's why it's - - I'm kind of a country guy and I say rubber meets the road. But this is - - to me, this is the most important decision a person can make.
>
> PROSPECTIVE JUROR: Yeah.
>
> MR. BRAMLETT: Personally, I don't know if anything, other than decisions I make with regard to my child, that could be any bigger than this. And what

45

I'm hearing from you is, you know, "I don't think I could vote and be a person that's responsible for killing another human." Is that an accurate statement?

PROSPECTIVE JUROR: Yes.

MR. BRAMLETT: And that particular view - -

PROSPECTIVE JUROR: Uh-huh. (Affirmative response.)

MR. BRAMLETT: - - would impair you from sitting as a potential - - as a juror on a death penalty case where that is, in fact, the punishment that the State is seeking?

PROSPECTIVE JUROR: Yes.

¶126. During questioning by the defense, Moore indicated that she could consider both aggravating and mitigating circumstances, weigh the evidence, and apply the law as provided by the court. And she indicated that she could vote for the death penalty if she found that the aggravating circumstances were not overcome by the mitigating circumstances.

¶127. Upon questioning from the trial court whether she could vote to impose the death penalty based on the law and the evidence, Moore responded yes.

¶128. Afterwards, the State moved to strike Moore for cause based on her incomplete questionnaire, her statements during voir dire that she could not vote for the death penalty, her inconsistent statements, and her demeanor. The trial court granted the State's request.

¶129. The trial court found that Moore gave conflicting answers throughout questioning and noted as follows:

> When it came time to answer the question relative to "in this particular case is there any circumstance where you could impose the death penalty," I didn't total the responses, but there were multiple answers, multiple times when she could not, there were multiple times when she said she could and it's just

46

almost impossible for me to discern whether or not she can properly function here.

The trial court said that it was left with the impression that her views would prevent or substantially impair her performance or duties in accordance with the court's instructions.

¶130. This Court has "long held that it is the trial judge's domain to judge matters regarding credibility of a witness including prospective jurors." *King v. State*, 784 So. 2d 884, 887 (Miss. 2001) (citing *Harris v. State*, 527 So. 2d 647, 649 (Miss. 1988)). In *King*, this Court affirmed the trial court's decision to exclude prospective jurors who "repeatedly switched positions" regarding support for or opposition to the death penalty, "wavered on [their] stance regarding the death penalty[,] and exhibited an obvious confusion concerning the issue." *Id.* at 888.

¶131. We find the same here. The transcript shows that Moore gave different answers at different points during voir dire regarding her stance on the death penalty. And she appeared confused as to what her duties would require at the sentencing phase rather than guilt phase. Accordingly, we find that the trial court did not abuse its discretion by striking Moore for cause.

### c. Prospective Juror Number 99 (Shepherd)

¶132. For question 35 in her juror questionnaire asking her feelings regarding the death penalty, Shepherd stated as follows: "Depending on the crime (violent) I would advocate the penalty. Any other crime (non-violent) should not have such harsh consequence. In the case of harming masses (knowingly) this is the only case death should be considered." Shepherd

indicated for question 36 that she was opposed to the death penalty except in a few cases when it may be appropriate.

¶133. For question 41, Shepherd said that she did not agree with Mississippi's law regarding imposition of the death penalty for murder committed during the course of a robbery. She explained in the questionnaire her disagreement with the law as follows: "The current state law can allow anyone to be eligible for capital murder, allowing anyone to be eligible for the death penalty which is not justice for those whose crime was not truly intentional."

¶134. For question 40, which asked the respondent how he or she felt "about considering individual factors about a person's life to make a determination as to what the appropriate sentence should be," Shepherd replied: "I believe it is fair to consider an individual's past but can easily sway those who cannot relate to the individuals past especially if it comes to eco-socio difference."

¶135. During individual voir dire, Shepherd said that she had no conscientious scruples against the death penalty and that she would consider the evidence and the law in reaching a verdict. Consistent with her questionnaire, Shepherd stated that the only cases she personally believed were appropriate to inflict the death penalty were cases in which "masses were killed" but that she could consider the evidence and the law in determining the proper sentencing verdict.

¶136. When asked about her response to question 41, Shepherd stated that she looked up the difference between murder and capital murder on the internet and was led to believe "any type of murder can be eligible for capital murder and so that was the understanding that I had

48

when I was answering the question." The following exchange occurred during the State's questioning of Shepherd regarding question 41:

MR. BRAMLETT: All right. And the question specifically, in this particular instance that we're talking about, says "The law in the State of Mississippi says that an intentional murder, intentional taking of a life without legal excuse or justification committed in the course of a robbery is capital murder for which the death penalty may be imposed. Do you agree with this law?" And, you said no.

PROSPECTIVE JUROR: Uh-huh. (Affirmative response.)

MR. BRAMLETT: Correct?

PROSPECTIVE JUROR: Correct.

MR. BRAMLETT: And is that your - - does that truthfully and accurately reflect today your feelings about this particular law? You don't agree with it?

PROSPECTIVE JUROR: No. I - - I - - my personal belief is that if you commit a murder and there was not the initial intent, let's say, for instance, a terrorist attack, that's when I think - - that should be implied. Other than that, my experience, personally, has shown me that things can escalate in a way that your aren't expecting and you react a certain way. So when I looked up the law and saw that you had to have intent of murder, I took that as in - - I don't know if I can speak into the specifics of this case now that I kind of know what's going on, but - - can I answer that question like that?

THE COURT: Well, you can say whatever you think you need to say to explain your answer.

PROSPECTIVE JUROR: Okay. Well, when I was educated about this particular case, to me his initial intent wasn't murder, but I don't know any of the evidence or anything like that. I just know that he was going in to rob store, correct? And if he went in and robbed a store and somehow the robbery went wrong and he took lives, to me that's not the initial intent of murder. It'll be different in comparison to only going into - - into the store because I have a[n] issue with the owner or the child, or whatever the case is, and that's what I'm going here to do with it. If I'm in here and I take these lives and the register, I could take the, you know, the money in the register. That's - - that's the difference. That's how I - - I differentiate the two.

49

MR. BRAMLETT: So what I'm hearing from you - -

PROSPECTIVE JUROR: Uh-huh. (Affirmative response.)

MR. BRAMLETT: - - and the scenario you just went through - -

PROSPECTIVE JUROR: Uh-huh. (Affirmative response.)

MR. BRAMLETT: - - and your answer to that question, it stands the way I'm reading it. "The law in the State of Mississippi says that an intentional murder committed in the course of a robbery is a capital murder for which the death penalty may be imposed. Do you agree with this law?" You say no and that's what I'm hearing you say right now. If somebody is going in to rob somebody and somebody gets killed in the process, to you that's not capital murder because the original intent was to go in and rob somebody, right?

PROSPECTIVE JUROR: Basically. Because that's my understanding of what capital murder is, what the qualifications are. And I could be wrong because, like, I used Google. But Google is, like, you know, an official source, but that was what I had as my guide for understanding.

MR. BRAMLETT: Okay. Well, I can't Google - - and - - and I'm just being as direct as I can, okay?

PROSPECTIVE JUROR: Yeah.

MR. BRAMLETT: I can't Google your personal views. You have to tell me what they are.

PROSPECTIVE JUROR: Correct.

MR. BRAMLETT: And what I'm hearing your personal view is, is that you disagree with the law that makes a capital murder because someone gets killed during the course of a robbery, correct?

PROSPECTIVE JUROR: Yes. Because it was not the initial intent. Correct.

MR. BRAMLETT: All right. And then you go further and say that "Allowing anyone to be eligible for the death penalty, which is not justice for those whose crime was not truly intentional," and that is the backend of the original statement that you made, the original intent being robbery, if somebody was

killed, you don't feel like the death penalty is justified in that situation, correct?

PROSPECTIVE JUROR: Not cap - - no. No.

MR. BRAMLETT: Not capital murder?

PROSPECTIVE JUROR: No. I don't - - no.

¶137. When questioned further by the trial court, Shepherd indicated that despite her disagreement with Mississippi's capital murder law, she could still consider the law along with the evidence presented in reaching a sentencing verdict.

¶138. The trial court granted the State's request to strike Shepherd for cause. The trial court noted that "there was no shortage of opinions from this particular juror and she was very eloquent I think in trying to explain what her opinions were and where they came from." The trial court noted also that there were several instances in which Shepherd insisted she could set aside her opinions and base a verdict on the law given. But the court ultimately concluded that some of Shepherd's voir dire responses, along with her questionnaire responses called into question her ability to faithfully and impartially apply the law.

¶139. We must defer to trial court's decision. Although Shepherd expressed a number of times that she could put aside her personal opinions and consider the law as instructed by the court, this does not compel us to find an abuse of discretion by the trial court in its conclusion otherwise.

¶140. Again, matters regarding the credibility and suitability of a prospective juror lie with the trial court "who sees and hears the juror." *Wainwright*, 469 U.S. at 426; *King*, 784 So. 2d at 887. As *Witt* makes clear, *Witherspoon* removal does not require that the trial court

51

find a prospective juror's bias "unmistakably clear"; rather, the court must be "left with [a] definite impression" of the prospective juror's inability to apply the law impartially. *Witt*, 469 U.S. at 424-26 (internal quotation marks omitted).

¶141. Both in her juror questionnaire and voir-dire examination, Shepherd expressed strong sentiment against the death penalty for robbery murder under Mississippi law. She never wavered in her opinion that the death penalty should not be an option if the original intent was robbery and a killing resulted. She also asserted her opinion about this case:

> Well, when I was educated about this particular case, to me his initial intent wasn't murder, but I don't know any of the evidence or anything like that. I just know that he was going in to rob a store, correct? And if he went in and robbed a store and somehow the robbery went wrong and he took lives, to me that's not the initial intent of murder.

¶142. Earlier during her voir dire examination, when the State asked about her view that the death penalty should be used only in cases in which masses are killed, Shepherd responded, "Yes, if I was the judge." The State followed up saying, "you realize in this particular case in Mississippi in a death penalty case you are the judge. You're the person that determines that; is that correct?" Shepherd responded, "Correct." Then when asked whether her view on the death penalty would prevent her from imposing the death penalty in a case that did not involve mass killings, Shepherd responded, "No. Because, I mean, that's the law."

¶143. In response to the State's challenge for cause, the defense acknowledged that Shepherd was "verbose" in voicing her opinions and had a misconception about Mississippi law "based on her cursory Google search." But the defense submitted that Shepherd seemed

52

very clear that she would set aside her personal views and consider the law and the court's instructions.  The trial court disagreed.

¶144.  We cannot glean Shepherd's demeanor from a transcript.  *See **Uttecht***, 551 U.S. at 17 ("because a transcript cannot fully reflect that information").  But the trial court could, having heard and observed Shepherd.  Her disagreement with Mississippi law, the fact that she conducted her own outside research on the law, and the fact that she had already reached a personal opinion about how the law should apply in this case clearly gave the trial court cause for concern.  We cannot say that based on this evidence the trial court's decision to excuse Shepherd for cause was unreasonable.

> **2.** **Clark's cause challenges to four prospective jurors disqualified under *Morgan v. Illinois*, one of whom then served as a trial juror, were erroneously refused by the trial court.**

¶145.  Those who would automatically impose a life sentence in a death penalty case, despite the evidence and the law, should be excluded from serving as jurors in the case; likewise, those who would automatically impose the death penalty, despite the evidence and the law, should also be excluded.  ***Duplantis v. State***, 644 So. 2d 1235, 1245 (Miss. 1994) (citing ***Witherspoon***, 391 U.S. at 522 n.1; ***Morgan***, 504 U.S. at 729). The ***Morgan*** Court held that "it is a violation of a defendant's due process rights to prevent him, in a capital case, from inquiring whether prospective jurors would automatically impose the death penalty upon a conviction[.]" ***Foster v. State***, 639 So. 2d 1263, 1273 (Miss. 1994) (citing ***Morgan***, 504 U.S. at 729).  "A juror who will automatically vote for the death penalty in every case will fail in

good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan*, 504 U.S. at 729.

¶146. As the State points out and Clark acknowledges, by removing Scruggs, Powell, and James with his peremptory challenges, Clark cured any error that may have been present by the trial court's refusal to excuse these prospective jurors for cause. *Evans v. State*, 725 So. 2d 613, 653 (Miss. 1997) (citing *Chase v. State*, 645 So. 2d 829, 845 (Miss. 1994)). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988).

¶147. Also, because Clark did not utilize an available peremptory strike against Prospective Juror 41 (Sistrunk) when he had one remaining, he cannot now claim error on appeal. *See Hansen v. State*, 592 So. 2d 114, 129 (Miss. 1991) ("Our settled rule requires that, before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges.").

¶148. Clark submits, however, that "at least where one of the jurors biased as to sentencing actually sat, this Court must revisit this precedent and reverse Clark's death sentence for plain structural error." We decline to revisit our precedent, and we reiterate:

> [T]he appellant has the power to cure substantially any error so long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had power to do.

*Chase*, 645 So. 2d at 845-46 (alteration in original) (quoting *Hansen*, 592 So. 2d at 129-30).

¶149. Procedural bar(s) notwithstanding, we find no merit to Clark's claim that the trial court erred by not excusing for cause either Sistrunk, Scruggs, Powell, or James.

### a.     Prospective Juror Number 41 (Sistrunk)

¶150. Describing his feelings about the death penalty in his jury questionnaire, Sistrunk wrote that he "believe[s] the punishment should fit the crime. 'Eye for an Eye.'" He indicated that he is strongly in favor of capital punishment as an appropriate penalty, and he indicated that he would vote to give it in every case that allows it. For question 40 concerning consideration of the circumstances of the defendant's "life, character, history, and background and any circumstances of the offense," Sistrunk wrote: "Stick to the facts of the crime committed."

¶151. During individual voir dire, Sistrunk said he has no problem with the death penalty, but he would consider any mitigating factors presented. After the State explained that under our law, the death penalty is and should not be automatically given just because the defendant is found guilty, Sistrunk said his decision would depend on the facts and circumstances of the case and would not be automatic. And he indicated this is how he should have responded on his jury questionnaire. As an engineer, he is accustomed to looking at and analyzing all of the facts before making a decision, and he would do the same here when considering the appropriate punishment.

¶152. The trial court denied Clark's challenge for cause. The court found that Sistrunk, like many of the other venire members, did not fully understand what the law is and means when they filled out their questionnaires having never been through the system. Having heard his

testimony and watched his demeanor, the court found that Sistrunk would be able to faithfully and impartially apply the law as instructed.

¶153. We find no abuse of the discretion in the trial court's decision. *King*, 784 So. 2d at 887. There is no showing at all that Clark was denied his right to a fair and impartial jury by Sistrunk's presence on the jury.

> **b.** **Prospective Juror Number 3 (Scruggs), Prospective Juror Number 8 (Powell), Prospective Juror Number 17 (James)**

¶154. Each prospective juror indicated on their juror questionnaires that they are strongly in favor of capital punishment as an appropriate penalty. Describing their feelings toward the death penalty, Scruggs and James said they believe in an "eye for an eye." And Powell believes the death penalty "is biblical." Scruggs and James indicated that they would vote for the death penalty in every case that allows it. Powell indicated that her decision would depend on the facts and circumstances of the case.

¶155. For question 40, Powell said "we all have choices to do the right thing and circumstances of life become an excuse to do the wrong thing — the easy way out." Scruggs said her "feelings are for the victim and the victim's family that have to live without their loved one." James said, "It would be very hard for me to find a mitigating circumstance that would excuse murder. Most people know right from wrong no matter what life you've lived."

¶156. During individual voir dire, each was questioned regarding their various questionnaire responses. Powell said she does not oppose the death penalty, and she believes it is appropriate. But she is not "the extreme to give it every time" and would not automatically

impose it. She believes "the circumstances dictate the penalty." She stood by her questionnaire response to question 40 that life circumstance is sometimes used as an excuse. But she would "absolutely" consider and weigh any mitigating circumstances appropriately.

¶157. Scruggs said that after "what we've heard over the past day-and-a-half and the - - rules and the laws of the State of Mississippi and from the honorable judge here" her questionnaire responses were "based on a questionnaire and not on the instructions that would be given by the court of law." She said she felt differently after hearing the process and how everything is supposed to work. She maintained that she believes in the death penalty, but she would not give it in every case that allows it. She said she knows, "after sitting here for a day-and-a-half, that everybody gets a fair trial and - - that we have to be open-minded and to be able to take the facts of the case and utilize that to give the best judgment and the best sentence as applicable." She said she would follow the law and the instructions given to her by the court.

¶158. Clark sought to have James removed for cause because he would "place an undue burden or a burden, period, on the Defense to present mitigation where there is no burden." When asking James whether he understood the process about weighing aggravating factors and mitigating factors, and whether James understood what was meant by mitigating factors, James had responded, "Yes. I - - I think of how he was brought up and what - - has happened in your life." James added, "It would take a lot to sway me. Everybody should know right from wrong[.]" Defense counsel then asked James if he believed that it would be incumbent upon the defense to "present such powerful mitigation to you before you would

57

consider it as overcoming anything else?" James responded, "It would have to be a fairly significant something that happened in his life to - - or along the way."

¶159. At that point, the trial court also asked James if he understood that mitigating circumstances would be considered for the sentence to be imposed, not to excuse the murder or to reduce it to some lesser offense. "You would have already found guilt for capital murder before you ever got to this stage and then mitigating circumstances and the aggravating circumstances are only an issue as to the sentence to impose either the death penalty or life. Do you understand that?" James said he understood. He said, "hearing the facts, I - - I would have to take a closer look. I'm not going to take someone's life lightly anyway."

¶160. After the defense finished its questions, the trial court again reiterated what the sentencing process would entail regarding aggravating and mitigating circumstances and inquired whether James could consider and weigh those circumstances and impose a life sentence if aggravating circumstances did not outweigh the mitigating circumstances or a death sentence if he believed the aggravating circumstance outweighed the mitigating circumstances. James responded affirmatively, and he guaranteed the trial court he would not automatically impose one or the other.

¶161. In hearing the defense's motion to excuse James, some concern was raised with regard to the burden of proof required at sentencing. Following a short recess to allow the trial court to study the issue further, the trial court reiterated for the record the rule as articulated by this Court in *Wiley v. State*, 484 So. 2d 339, 352 (Miss. 1986), *vacated on other grounds by*

*Wiley v. State*, 635 So. 2d 802 (Miss. 1993): " The majority rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute."

¶162. Afterwards, the trial court summoned James back to the courtroom and questioned him further to make sure there was no misunderstanding as to burden of proof at sentencing. The trial court explained that the State was required to put on proof of aggravating circumstances, the proof of which the jury was required to find beyond a reasonable doubt. And that was to be an instruction given to the jury by the court. The jury also was to be instructed to list those aggravating circumstances, as well as any mitigating circumstances shown by defense's evidence. The instructions then would require the jury to balance or weigh the aggravating circumstances and the mitigating circumstances. The trial court explained to James that the defense does not have a burden to put on any proof whatsoever; rather, the burden is placed on the State "to put on proof of aggravating circumstances which must exist before you could impose a sentence of death." James said he understood and would abide by those instructions from the court.

¶163. Upon further questioning by the defense, James said he would not place a burden on the defense to prove any mitigating circumstances beyond a reasonable doubt.

¶164. The trial court declined to excuse Scruggs, Powell, and James for cause. According to the transcripts for each prospective juror, the trial court noted that they, like many other venire members, did not know the rules and the process that would be required of them until

it was described or explained to them. For each, the trial court found, based on their demeanor, answers, and assurances to the court, that their respective views toward the death penalty would not prevent or substantially impair their duties as a juror in accordance with the court's instructions and their oaths.

¶165. We find no plain error on appeal as to the trial court's refusal to strike these prospective jurors for cause.

> **C.** **During jury questioning and selection, the trial court improperly limited defense voir dire about matters necessary to offset misleading or confusing questioning by the Court and the State to determine if jurors had the capacity to fairly and properly consider sentence in this matter, and/or to effectively probe whether prospective jurors' subjective statements professing that were in fact reliable. The trial court compounded these errors by then failing to instruct the jury concerning the subjects in which it improperly restricted voir dire.**

¶166. Clark claims that the trial court limited defense voir dire from fully probing prospective jurors for possible prejudices that might impair them from being able to perform their constitutional duties at the penalty phase. He submits he sought by way of pretrial motions to secure the kind of voir dire necessary to seat an impartial sentencing jury and went into individual voir dire on death penalty matters, based on the trial court's disposition of these motions.

¶167. He submits the error was compounded by the trial court's erroneous denial of certain jury instructions that might have limited or mitigated the prejudice resulting from these erroneous restrictions in voir dire.

¶168. The purpose of voir dire in any jury case is to ensure the empaneling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court. Again, prospective jurors who automatically would vote for or against the death penalty despite the evidence and the law as instructed by the trial court "cannot follow the dictates of law." *Morgan*, 504 U.S. at 735. Thus, it is a violation of due process to prevent a capital defendant from inquiring whether prospective jurors would automatically impose the death penalty upon a conviction. *Id.* at 729.

¶169. *Morgan*, however, also reaffirmed that "[v]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Id.* at 729 (quoting *Ristaino v. Ross*, 424 U.S. 589, 594, 96 S. Ct. 1017, 1020, 47 L. Ed. 2d 258 (1976)). "The Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Id.*

¶170. Here, the trial court entered an order to Clark's pretrial motions regarding voir dire proceedings as follows:

> All questions that the Court intends to ask of the potential jurors concerning issues related to the death penalty and related matters, shall be announced to the parties prior to the beginning of individual sequestered voir dire, outside the presence of the jury. All objections and argument of counsel for the State or the Defendant, to any such proposed questions intended to be asked by the Court shall be made at that time, and the Court shall then rule on those objections. All other matters raised in the above enumerated Motions shall be ruled upon at such time as the Court's questions are announced, if the Defendant believes that the Court's questions as announced do not adequately address the issues in said Motions.

61

¶171. Prior to individual voir dire proceedings, the trial court provided both parties a script of questions the trial court would ask each prospective juror before turning voir dire examination over to the parties. The defense entered no objection to those questions.

¶172. On appeal, Clark makes general assertions and cites various transcript pages covering the individual voir dire proceedings, which he contends demonstrate the trial court would "be inclined, at least with respect to the capacity to consider mitigating evidence, to focus only on abstract representations, rather than what the jurors were actually saying in light of the case or their particular view points."

¶173. For instance, Clark contends that "before individual voir dire of nearly half of the jurors who would in fact be actually tendered for jury service was completed, the trial court announced its intent, at least with respect to understanding mitigation, to limit voir dire to obtaining abstract general information about the jurors' ability to follow the law." Clark then simply references pages "925, 929-30" of the individual voir dire transcript for Prospective Juror Number 44 (Ragland) as an example.

¶174. We fail to see the problem. As the State elucidates in its brief, during the State's voir dire examination of Ragland, the prospective juror had said he would not automatically vote for the death penalty just because the defendant was convicted of capital murder. When asked what he would consider, the prospective juror responded, "Circumstances. Intent." When asked if he would consider the defendant's background, the prospective juror asked the prosecutor what he meant. The prosecutor replied, "His history. His life experiences, good or bad. Would that be a form of mitigation you would consider?" The prospective juror

said, "No."  When asked why not, the prospective juror said, "You know, if - - if a crime was committed it would be based on the crime.  I mean, to have some - - you know, somebody's past isn't going to influence the crime."

¶175.  The prosecutor then clarified that they were not talking about the defendant's guilt or innocence for the crime itself, but rather the sentencing.  The prosecutor then asked, "what does mitigating factors mean to you?"  The prospective juror replied, "Circumstances around the crime."  The following exchange then occurred:

> MR. BUCKLEY: Okay.  That's not mitigating factors.  Let me read to you mitigating factors here: "The jury must consider any aspect of the defendant's life, character, history, and background and any circumstances of the of offense."  That's referred to as mitigating circumstances.  So the defendant's life, character, history, and background.  If the Defense puts that on, the law says you must consider that.  You must consider that at the sentencing phase.  And if you can't do it, we need to know now.  But if you can follow the law, we need to know if you can follow the law.

> PROSPECTIVE JUROR: I can follow the law.

> MR. BUCKLEY: Okay.  And so the law is if he puts on any evidence of the defendant's life character, history, you have to consider that in weighing life versus death.  Do you understand?

> PROSPECTIVE JUROR: Yes.

> MR. BUCKLEY: Okay.  Can you do that?

> PROSPECTIVE JUROR: Yes.

> MR. BUCKLEY: All right.  Is it clear as mud now?

> PROSPECTIVE JUROR: Yeah.

¶176.  After the State tendered the witness to the defense, the trial court asked the prospective juror to step out of the courtroom and spoke to the parties:

63

THE COURT: All right. You know, we're questioning these folks and they don't know the law and they've not been instructed on the law.

But, Mr. Buckley, then he was describing some circumstances of the offense as being what he considered to be mitigating factors. You told him that wasn't part of it, but it is part of it. He can consider circumstances of the offense, any circumstances of the offense. And so I feel like it's important to - - that's why I get worried that we're going into too much detail sometimes because these guys don't have all the instructions of law before them to be able to maybe answer some of the detailed questions that are being asked. But I don't want them to think that - - I'm - - I'm concerned that when we're getting too much in detail that we may be cutting some corners that we don't need to cut and circumstances of the offense can be a mitigating factor.

And so, Mr. LaBarre, when you're questioning him, if you want to bring that up, or I'll bring it up, but I'm, not just with this witness but with some of the other witnesses as well, I think we need to remember that these folks, probably before today or - - they wouldn't know a mitigating circumstance from a bag of popcorn, and I'm not sure that - - I'm not sure that we can probably describe that for them, either the aggravating circumstances or the mitigating circumstances, and so I don't want us to leave them with a misimpression here about what is and what is not. I'd feel more comfortable if we relied upon them following the instructions of law that they're given at the conclusion of the case that they don't have right now, but - - so, Mr. LaBarre, if you don't cover that in your examination, I'm going to cover that in questioning him after to make sure that he understands that the circumstances of the offense can be a mitigating factor, all right?

MR. LABARRE: You said mitigating. Do you mean aggravating?

THE COURT: No, I mean mitigating.

MR. LABARRE: Circumstances of the offense?

THE COURT: Any of the circumstances of the offense are in your question here.
. . . .

MR. LABARRE: I never thought about the circumstances of the offense being mitigating, your Honor, but it can be.

64

¶177. As the State points out, the trial court then advised the parties that the purpose of the individual voir dire was to discover if the prospective jurors would, regardless of their personal views on capital punishment, consider both aggravating and mitigating circumstances evidence if called upon to deliberate the appropriate sentence.

¶178. Afterwards, Ragland was called back into the courtroom and questioned further by the trial court and by the defense. He was accepted by the State without objection from defense counsel, which stated: "I have no objection. . . . [W]ith the education process, I think that he better understands and we better understand him and I do not object or have any challenge for cause."

¶179. Clark next references in his brief pages "946-48" of the transcript for the contention that, "the trial court added further strictures to Clark's voir dire of jurors, this time with respect to querying them about their capacity to make mitigation decisions, and ultimately their sentencing decisions, individually, and their understanding that under the law sentence would be finally determined even if the jury could not agree."

¶180. Again, we fail to see the problem. This portion of the record shows that after another prospective juror's individual voir dire concluded, the State voiced its concern with the trial court that the defense was getting into improper inquiry with some of the prospective jurors regarding jury deliberations. The trial court disagreed, stating that it was appropriate for the defense to ask prospective jurors if they would respect the opinion of the fellow jurors. The trial court stated as follows:

> So as long as it's limited to respecting the opinions, I don't believe it's a problem. If you believe there's something said that crosses that line, you can

65

bring it up and I'll, you know, if necessary, just say exactly what I would anticipate the instruction to be if it's something that needs to be cured. But, honestly, I don't think I've heard that yet.

¶181. We agree with the State that the trial court in no way instructed or limited the defense from asking any questions during individual voir dire for the purpose of determining a prospective juror's suitability in the case at hand. Accordingly, we find no merit to Clark's various claims otherwise.

¶182. We also find no merit to Clark's claim that the trial court erred by denying certain jury instructions that might have limited or mitigated the prejudice resulting from these erroneous restrictions in voir dire:

> DS-12 (explaining the stepwise process by which aggravation, mitigation, weighing and ultimate sentencing decision must be undertaken); DS-13 (presumption that life is proper sentence unless evidence overcomes that); DS-15 (individual nature of entire sentencing decision); DS-22 (Mercy as mitigation even in the presence or the absence of any other mitigation); DS-26 (Sympathy for defendant may be considered in mitigation of sentence); and DS-28 (individual finding of mitigation, no unanimity required).

¶183. Our standard of review when considering the trial court's decision on jury instructions is as follows:

> "It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010) (citing *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009) (internal citations omitted)). When considering whether error lies in granting or refusing a jury instruction, the instructions actually given must be read as a whole and in context. *Ruffin v. State*, 992 So. 2d 1165, 1176 (Miss. 2008) (citations omitted). No reversible error exists if the instructions fairly, though not perfectly, announce the law of the case and create no injustice. *Rubenstein v. State*, 941 So. 2d 735, 784-785 (Miss. 2006) (citations omitted). "A defendant is entitled to have jury instructions given which present his theory of the case[;] however, this entitlement is limited in that the court may refuse an

66

instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Agnew v. State*, 783 So.2d 699, 702 (Miss. 2001) (citations omitted).

*Ronk v. State*, 172 So. 3d 1112, 1125 (Miss. 2015) (alteration in original).

¶184. The trial court refused DS-12 because it was fairly covered in S-13b. DS-13 was refused because this Court has repeatedly rejected the "proposition that a defendant should go into the sentencing phase with a presumption that life [imprisonment] is the appropriate punishment." *Gillett v. State*, 56 So. 3d 469, 514 (Miss. 2010) (internal quotation marks omitted) (quoting *Brown v. State*, 890 So. 2d 901, 920 (Miss. 2004) (quoting *Watts v. State*, 733 So. 2d 214, 241 (Miss. 1999))). DS-15 was refused because it was found to be cumulative. DS-22 is a mercy instruction, which instructed the jury that "the exercise of mercy can itself be a mitigating factor you may consider." The trial court refused it, allowing instead the defense to argue it to the jury. This Court repeatedly has held that "capital defendants are not entitled to a mercy instruction," *id* at 518-19 (internal quotation marks omitted) (quoting *Chamberlin v. State*, 989 So. 2d 320, 342 (Miss. 2008)), so as "to avoid the potential arbitrariness of an emotional decision encouraged by a mercy instruction." *Id.* at 518-19. DS-26 was refused because it was fairly covered by S-13b. And DS-28 was refused because it was found to be cumulative.

¶185. Based on our review of the record, we find that the trial court did not err by denying proposed jury instructions DS-12, DS-13, DS-15, DS-22, DS-26, and DS-28.

> **D.** **The trial court erred by failing to quash the venire summoned in this case and in seating a trial jury drawn from that venire because both the summoned venire and the jury wheel from which it was**

67

**drawn completely eliminated all persons with surnames beginning with letters V through Z.**

¶186. Clark moved pretrial to quash the jury venire because it failed to represent a fair cross-section of the Madison County community from which it was drawn. Clark contends the evidence supporting the motion and adduced at the hearing established without dispute that neither the venires drawn for this case, nor the larger jury wheel from which all Madison County venires were drawn during 2018 contained anyone whose surname began with the letters V through Z.

¶187. The trial court denied the motion, finding that Clark had failed to establish the first prong under *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). *Duren* holds that to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement, the objector must show the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364.

¶188. According to the State, this Court has not addressed whether persons whose names begin with certain letters of the alphabet may constitute a distinctive group under *Duren*. But the Court of Appeals addressed the issue in *Presley v. State*, 9 So. 3d 442, 444 (Miss. Ct. App. 2009). There, the Court of Appeals found no error in the trial court's denial of the defendant's motion to quash the venire, arguing that its selection was nonrandom because it did not contain potential jurors with the letters T through Z. *Id.* at 443.

68

¶189. **Presley** noted:

> While the United States Supreme Court has not precisely defined a "distinctive group" under the first prong of the test, it has stated that such may include "economic, social, religious, racial, political[,] and geographical groups." *See* **Thiel v. S. Pac. Co.**, 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181 (1946); *see also* **Witcher v. Peyton**, 405 F.2d 725, 727 (4th Cir. 1969) ("a cross-section of the community includes persons with varying degrees of training and intelligence and with varying economic and social positions.").

*Id.* at 444. **Presley** found that the defendant failed to meet **Duren**'s first prong "as persons whose names begin with certain letters of the alphabet do not constitute a distinctive group." *Id.* (citing **United States v. Puleo**, 817 F.2d 702, 706 (11th Cir.1987), *cert. denied*, 484 U.S. 978, 108 S. Ct. 491, 98 L. Ed. 2d 489 (1987) (process that resulted in excluding persons with the last names beginning with M-Z, "d[id] not systemically exclude a distinctive group of the community")). We agree with the Court of Appeals' analysis.

¶190. Similarly, we find no error in the trial court's to decision to deny Clark's pretrial motion to quash the venire summoned in this case. We agree with the State that Clark failed to demonstrate **Duren**'s first prong to the trial court.

¶191. After holding a hearing on the matter, the trial court found that the county clerk sufficiently followed the statutory procedures for the jury selection process. And no showing was made that the jury wheel used for the 2018 term actually lacked surnames beginning with the letters V through Z.

¶192. Further, of the approximately five hundred jury questionnaires that were mailed to the prospective jurors summoned for this case, only 152 or 154 of the questionnaires had been

returned at the time of the hearing. Thus, we also agree with the State that Clark's underrepresentation claim was based on incomplete data.[6]

¶193. Accordingly, we find no error with the trial court's decision to deny Clark's motion seeking to quash the jury venire.

> **II. Must Tony Clark's death sentence be vacated and replaced with a sentence of life in prison without the possibility of parole because the trial court reversibly erred when, after failing to properly instruct the jury on the consequences of verdicts either to impose a life sentence or to fail to agree on sentence, it denied Clark's motions to discharge the jury and impose a LWOP sentence for capital murder when the jury could not, in fact, agree on sentence?**

¶194. Clark contends the trial court erred by refusing two proposed defense instructions: DS-31 and DS-19.

¶195. DS-31 says: "If you cannot, within a reasonable time, agree as to punishment, I will dismiss you and impose a sentence of life imprisonment without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this."

¶196. DS-19 says: "If Tony Clark is sentenced to life imprisonment without the possibility of parole or early release then he will spend the rest of his natural life incarcerated by the Mississippi Department of Corrections. His life sentence without possibility of probation or parole cannot be judicially or administratively reduced or suspended. The [c]ourt instructs

---

[6] Clark argued that Madison County's population is approximately 57 percent white according to 2010 census data, but the juror questionnaires returned reflected a group which was 75 percent white and 25 percent black. Clark acknowledged, however, that his underrepresentation claim was based on incomplete data because only 30 percent of the questionnaires had been returned at the date of the hearing.

70

the jury that if you sentence Tony Clark to death, he will be executed by the State of Mississippi."

¶197. The trial court denied DS-31, finding no legal authority for the instruction. The trial court denied DS-19, finding it fairly covered by other jury instructions.

¶198. We find no merit to Clark's claims. As to DS-31, Mississippi Code Section 99-19-103 (Rev. 2020) provides: "If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."

¶199. While the instruction is a correct statement of law, this Court, however, has held that "[t]he statute does not . . . allow the jury to determine what constitutes a 'reasonable time' for deliberations and report its findings to the court." *Wilcher v. State*, 697 So. 2d 1123, 1136 (Miss. 1997). In *Gillett*, 56 So. 3d at 515-16, this Court upheld the trial court's denial of an identical instruction to DS-31. Quoting from *Edwards v. State*, 737 So. 2d 275 (Miss. 1999), *Gillett* provided as follows:

> [Gillett] claims that this instruction correctly stated the law according to Miss. Code Ann. § 99-19-103. Miss. Code Ann. § 99-19-103 (1994) provides that "[i]f the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."
>
> However, jury instructions "are not to be read unto themselves, but with the jury charge as a whole. . . . Instructions CS-2 and CS-3 make clear the options the jury had in returning to the courtroom:
>
> (1) . . . we . . . unanimously find the Defendant should suffer death.
>
> (2) We, the Jury, find that the Defendant should be sentenced to life imprisonment without the possibility of parole or early release.
>
> (3) We, the Jury are unable to unanimously agree on punishment.

71

> Thus, when read as a whole, the jury instructions properly informed the jury that it could return to the courtroom and report that it was unable to agree unanimously on punishment. *Wilcher v. State*, 697 So. 2d 1123, 1136 (Miss. 1997). D-S10 was a cumulative instruction. There is no error in the denial of a cumulative instruction. *Walker v. State*, 671 So. 2d at 613.

*Gillett*, 56 So. 3d at 516 (second and third alterations in original) (quoting *Edwards*, 737 So.

2d at 316-17).

¶200. *Gillett* further provided,

> Moreover, even if the jury had never been instructed on what would happen if they could not agree, there would have been no error. In *Stringer v. State*, this Court held that the trial judge did not err by failing to inform the jury that, "if they were unable to agree within a reasonable time on the punishment to be imposed, [the defendant] would be sentenced to life imprisonment." *Stringer*, 500 So. 2d 928, 945 (Miss. 1986).

*Id.* (quoting *Wilcher*, 697 So. 2d at 1136-37).

¶201. Here, the trial court granted the State's proposed instruction S-13b, which as the State points out, concluded with a form of the verdict instruction giving the jury essentially three options: to return a sentence of death or life without parole, or to report that they "are unable to agree unanimously agree on punishment." S-13b also informed the jury, "You, as a juror, always have the option to sentence Tony Terrell Clark to life imprisonment without parole, whatever findings you make."

¶202. As to DS-19, this Court has repeatedly declined to require it. *Ambrose*, 254 So. 3d at 149; *Keller v. State*, 138 So. 3d 817, 870 (Miss. 2014); *Pitchford*, 45 So. 3d at 256; *Gillett*, 56 So. 3d at 517-18; *Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

¶203. In *Flowers*, this Court was presented with the question of whether a jury should receive an instruction clarifying what life without parole means. *Flowers* held that, "[b]y

72

giving only the sentencing options of death or life imprisonment without parole, the trial judge properly gave the jury all the instructions that were needed." *Flowers*, 842 So. 2d at 557 (citing *Pham v. State*, 716 So. 2d 1100, 1103-04 (Miss. 1998)).

¶204. Here, since the jury was informed of the sentencing options of death or life imprisonment without parole, the trial court did not err by denying DS-19.

¶205. Clark recognizes and acknowledges that this Court has repeatedly upheld a trial court's denial of these two particular types of instructions. He contends, however, that an exception should be made here because the jury had notified the trial court that it could not agree on sentencing and expressly requested information on the consequences. Clark submits that the trial court should have then instructed the jury with DS-31 as defense counsel re-urged upon being apprised of the jury's request.

¶206. We find no error in the trial court's decision. According to the record, the jury began deliberations at approximately 6:00 p.m. after having been in court since 8:30 a.m. that day. The parties agreed at 10:00 p.m. that evening to inquire of the jury foreperson whether the jury needed to recess or wished to continue with deliberations. The foreperson informed the court that the jury needed a break. The trial court recessed for the evening, and the jury resumed deliberations at 9:00 a.m. the next morning.

¶207. The next morning, defense counsel asked the trial court to reconsider DS-31, which the trial court declined to do. The trial court noted for the record that the jury did not begin deliberations the previous evening until approximately 6:00 p.m. and that they had eaten dinner at one point during that time. So the trial court estimated that the jury had only

deliberated approximately three hours, which the trial court did not find to be an unreasonable amount of time.

¶208. After the jury continued deliberating, they sent out a note stating, "We are currently unable to agree unanimously on punishment. Question: What normally happens if we choose option 3. Realistically, what happens?"

¶209. At that point, defense counsel submitted that the jury had already deliberated for a reasonable period of time and requested that the court dismiss the jury and impose a sentence of life without parole. The trial court denied the request, finding that a reasonable amount of time had not been exceeded for the jury to deliberate. The trial court then instructed the jury by return note, stating, "That is not something that you should consider during your deliberations." After further deliberations, the jury unanimously agreed that Clark should be sentenced to death.

¶210. The record is unclear exactly how long the jury had been deliberating when it sent out the last note. The jury began deliberating the day before at approximately 6:15 p.m., and the trial court subsequently recessed for the evening at approximately 10:00 p.m. The jury began deliberations the next morning at approximately 9:09 a.m. At 10:34 a.m., the jury sent a note saying they were unable to agree on punishment. At 11:07 a.m., the trial court determined that a reasonable amount of time had not passed and sent the above-mentioned instruction. At 2:00 p.m., the jury reached a verdict. Defense counsel estimated that total deliberation time was approximately eight hours and forty minutes. This did not include the time for

74

meals and breaks, which the trial court took into consideration for each of the defense counsel's motions to dismiss the jury.

¶211. "[T]he determination of what is a reasonable time for deliberations is within the trial judge's discretion." *Batiste*, 121 So. 3d at 868 (citing Miss. Code Ann. § 99-19-103 (Rev. 2007) (noting that this Court had previously held that a four hour and forty minute deliberative period is not an unreasonable time for deliberation on punishment (citing *Smith v. State*, 729 So. 2d 1191, 1221 (Miss. 1998))).

¶212. Here, the trial court noted that it had instructed the jury not to deliberate when they were separated, and when they were eating meals provided to them. The record indicates that the jury had deliberated for approximately four and a half hours when they last informed the trial court that they had not reached a verdict. Even if the full eight hours and forty minutes were counted, we cannot conclude that duration constituted an unreasonable amount of time.

¶213. For the first time on appeal, Clark also contends that the trial court, in effect, told the jury not to consider Section 99-19-103's third option when it responded to the jury's question by stating, "That is not something you should consider during your deliberations."

¶214. According to the record, Clark did not object to the form of the trial court's response; thus, the argument on appeal is procedurally barred. *Swanagan v. State*, 229 So. 3d 698, 706 (Miss. 2017). Procedural bar notwithstanding, we find no merit to Clark's argument on appeal.

¶215. Clark's argument on appeal is essentially the same that was submitted in *Flowers*, 240 So. 3d at 1142, *reversed and remanded on other grounds by Flowers*, 139 S. Ct. 2228.

There, the jury sent a note to the trial court which stated: "If we cannot agree unanimously [on punishment], who will make the ultimate decision?" *Flowers*, 240 So. 3d at 1142. The trial court responded to the note, stating: "That is not an issue the jury should be concerned about." *Id.* (internal quotation marks omitted)

¶216. Flowers claimed on appeal that the note made evident that "the jury did not receive guidance on what would happen if the jurors could not agree unanimously on a punishment." *Id.* Flowers thus argued that the trial court had erred when it denied proposed jury instruction "D-34," which, similar to DS-31 here, provided: "The [c]ourt instructs the jury that if you cannot, within a reasonable time, agree as to punishment, the court will dismiss you and impose a sentence of imprisonment for life without the benefit of parole." *Id.* (internal quotation marks omitted)

¶217. Finding no merit to Flowers's argument, we reiterated that this Court repeatedly has found that the trial court did not err by refusing the same type of proffered instructions in previous cases. *Id.* at 1142-43 (citing *Gillett*, 56 So. 3d at 515-16; *Edwards*, 737 So. 2d at 316). Similar to *Gillett* and *Edwards*, we found that Flowers's jury was instructed on three possible outcomes in the penalty phase: "death, life without parole, or being unable to agree unanimously on a punishment." *Id.* at 1143. Thus, we held that the trial court did not err by refusing proposed jury instruction D-34. *Id.*

¶218. Here, pursuant to jury instruction S-13B, Clark's jury was likewise instructed that it could reach three possible outcomes in the penalty phase: "death," "life imprisonment without eligibility for parole," or not being "[]able to agree unanimously on punishment."

76

¶219. We find that the jury was properly instructed, and we find no merit to this issue.

> **III. Must the capital-murder conviction be reversed because the trial court erroneously refused to instruct the jury on the lesser-included offense of child homicide?**

¶220. The trial court denied defendant's proposed manslaughter instruction D-15, which sought to instruct the jury on the crime of child homicide:

> The Court instructs the jury that if you find that the State of Mississippi has failed to prove each and every element of the crime of capital murder, then you may continue your deliberations to consider whether or not Tony Clark is guilty of child homicide.
>
> If you find from the evidence in this case, beyond a reasonable doubt, that:
>
> 1. On or about the 27th day of October, 2014, Tony Clark killed Muhammed Saeed, with said killing being without malice but said act being intentional and not accidental; and,
>
> 2. At the time of said act, Tony Clark was over the age of twenty-one (21) years and Muhammed Saeed was a child under the age of eighteen (18) years;
>
> Then you shall find Tony Clark guilty of child homicide.
>
> If the State has failed to prove any one of more of these elements of child homicide beyond a reasonable doubt, then you shall find Tony Clark not guilty of child homicide.

¶221. The trial court also denied proposed defense jury instruction D-14, a form-of-the-verdict instruction, which included the following options: not guilty, guilty of capital murder, guilty of first-degree murder, and guilty of manslaughter. The trial court found that both D-14 and D-15 had no evidentiary basis in the record.

77

¶222. The trial court relied on **Randall v. State**, 716 So. 2d 584, 590-91 (Miss. 1998), a capital murder case based on the underlying felony of robbery. There, the trial court denied a number of proposed defense instructions: "DG–9 was a simple murder instruction; DG–10 was a manslaughter instruction; DG–11 included both simple murder and manslaughter; DG–12 was an armed robbery instruction; DG–13 was a combined murder, manslaughter instruction; and, DG–14 was a manslaughter instruction." **Id.** at 590.

¶223. **Randall** affirmed the trial court, finding that "[a] lesser included instruction was not appropriate." **Randall** reiterated the rule that

> [a] lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge)

**Id.** (alteration in original) (quoting **Ballenger v. State**, 667 So. 2d 1242, 1255 (Miss. 1995)).

¶224. **Randall** found that the unrefuted testimony showed that the defendant and his accomplice followed the victims to their home to rob them, and no rational jury could find the defendant guilty of simple murder or manslaughter and not guilty of capital murder. **Id.** at 590-91.

¶225. Here, video evidence showed Clark enter the store, walk up to the counter, and shoot Muhammed in the head at point-blank range. Clark immediately then tried to shoot Fahd, but the gun jammed. According to Fahd's testimony, Clark shot Fahd in the stomach, telling him to "give it up." While lying on the ground, Fahd heard Clark ask Tony where they kept

the money. The video evidence shows Clark behind the counter attempting to open the cash register. He was thwarted by a vehicle that had driven up to the store.

¶226. Even when taking all of the evidence in the light most favorable to Clark, no rational jury could have disbelieved the attempted-robbery element of the State's case and also found Clark guilty of simple murder or manslaughter. Under Mississippi Code Section 97-3-19(2)(e) (Rev. 2020), Muhammed's murder was capital murder. And the trial court rightly refused instructions D-14 and D-15.

IV. **Must the death sentence be vacated because all of the aggravating circumstances instructed on were unsupported by the evidence and/or applicable law and because the jury was not instructed on a mitigating circumstance for which there was evidence?**

¶227. Clark contends that the trial court erred by granting two aggravating-circumstances instructions for the jury's consideration at sentencing:

1. Whether the capital offense was committed while the Defendant was engaged in the crime of armed robbery for pecuniary gain. [Aggravator 1]

2. Whether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. [Aggravator 2]

### 1. Armed Robbery for Pecuniary Gain

¶228. Clark claims the first aggravator is improper because it used the underlying robbery, which already elevated the homicide to capital murder, and because it combined two statutory aggravators. He claims the second aggravator had no evidentiary foundation.

¶229. The State contends that Clark is wrong on both claims. We agree with the State.

79

¶230. Clark acknowledges that this Court has upheld similar aggravating-circumstance instructions, but he encourages this Court to revisit and reconsider those decisions. He contends that Aggravator 1 entirely subsumes the crime for which Clark was convicted which makes Aggravator 1 a duplicative aggravator as a sentencing aggravator. This, Clark submits, violates *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

¶231. According to Clark, "[i]f the maximum sentence which may be imposed on a defendant in a finding of guilt is life imprisonment, the class of offenders is not sufficiently narrowed without a jury finding an additional element." Clark contends that an element is a discrete circumstance of the crime which is not subsumed within the other elements. Thus, under *Ring*, a defendant can only be constitutionally sentenced to death if it finds an aggravating circumstance that is an element distinct from the elements comprising the statutory crime for which life is the maximum punishment.

¶232. Clark argues that Aggravator 1 is also improper as a matter of law because it conflates two separate statutory aggravators—robbery murder and pecuniary gain. Clark submits that this Court has long prohibited instructing a jury on these two aggravators separately. He cites *Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991), and *Jenkins v. State*, 607 So. 2d 1171, 1182 (Miss. 1992). Clark requests that this Court revisit and reconsider those decisions that hold it is not error to submit a single aggravating-circumstance instruction to the jury that combines "armed robbery for pecuniary gain" and that we now hold that Aggravator 1 was improperly given.

¶233. As Clark acknowledges, this Court repeatedly has held that use of the underlying felony as an aggravating circumstance is constitutional. In *Gillett*, this Court rejected the same claim presented here.

> Relying primarily on *Ring* and *Apprendi*, the [defendant] maintains that the use of the underlying felony of armed robbery as an aggravating circumstance upon which the jury relied in returning a sentence was improper. However, evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See Bennett* [*v. State*], 933 So. 2d [930] at 954; *Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001); *Smith*, 729 So. 2d at 1223; *Bell v. State*, 725 So. 2d 836, 859 (Miss. 1998); *Crawford v. State*, 716 So. 2d 1028, 1049-50 (Miss. 1998). Furthermore, the United States Supreme Court has held that there is no constitutional error in using the underlying felony as the aggravator. *Lowenfield v. Phelps*, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). The Supreme Court stated in *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994), that "[t]he aggravating circumstances may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

*Gillett*, 56 So. 3d at 510 (alterations in original) (quoting *Ross v. State*, 954 So. 2d 968, 1014 (Miss. 2007)).

¶234. Further, as this Court has said, "the jury is not permitted to 'doubly weigh' aggravating circumstances; thus, listing armed robbery and pecuniary gain as *separate* aggravating circumstances could be unconstitutional in some factual circumstances." *Flowers*, 240 So. 3d at 1145 (quoting *Howell v. State*, 860 So. 2d 704, 756 (Miss. 2003)). But "[w]hen pecuniary gain and armed robbery are used within the *same* factor, . . . the concern of the jury 'doubly weighing' the aggravating factors is not present." *Id.*

¶235. Accordingly, we find that the trial court did not err by instructing the jury on this aggravating circumstance.

## 2. Avoiding Lawful Arrest or Effecting an Escape from Custody

¶236. Clark opposed Aggravator 2 on factual grounds. He contends there is no evidence that the capital offense itself was designed to assist in his escape at the time it was committed. He claims that even under the State's theory of the case, all that the evidence shows is that Muhammed was killed and that Fahd was shot and wounded solely for the purpose of allowing Clark to remove money from the cash register that Muhammed and Fahd were tending.

¶237. This Court has held that,

> Each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

*Wiley v. State*, 750 So. 2d 1193, 1206 (Miss. 1999) (quoting *Chase*, 645 So. 2d at 858).

¶238. In *Wiley*, the defendant shot and killed a convenience store owner during a robbery, during which the defendant also shot and wounded a witness to the robbery.[7] *Id.* at 1206. In holding that this aggravating factor was properly given in the case, *Wiley* provided as follows:

> The victims in this case knew Wiley. Furthermore, Wiley's efforts to dispose of and/or conceal the evidence of his crime are sufficient to support the avoiding arrest instruction. That is, there is evidence from which the jury could have reasonably inferred that a substantial reason for the murder was to

---

[7] The circumstances in *Wiley* were similar to those here. According to the direct appeal from Wiley's capital murder trial and death sentence, the defendant shot the store owner and his daughter with a shotgun as the father and daughter were standing just outside the store shortly after closing. *Wiley v. State*, 449 So. 2d 756, 757 (Miss. 1984). The daughter survived the shooting with severe injuries. *Id.*

conceal Wiley's identity, or cover his tracks, so as to avoid apprehension and eventual arrest.

*Id.*

¶239. As in *Wiley*, Fahd knew Clark and Teaonta, both of whom were previous customers. Video surveillance showed that they had parked their vehicle behind the store. Their faces were uncovered when they entered the store. After Clark shot Muhammed and Fahd, Clark pulled his hoodie over his head, and Teaonta pulled his shirt over his head. Teaonta stood as lookout while Clark attempted to open the cash register. Clark took Muhammed's phone before leaving the store and fleeing the scene in their vehicle.

¶240. We find that a jury could reasonably infer from this evidence that a substantial reason for the murder was to conceal Clark's identity or cover his tracks so as to avoid apprehension and eventual arrest. Accordingly, this issue is without merit.

## V. Did the trial court reversibly err in its evidentiary rulings at both phases of the trial.

¶241. Clark contends the admission of surrogate testimony by Deputy Chief Medical Examiner Dr. Brently Davis violated his Sixth Amendment Confrontation Clause rights. Clark also contends that the trial court erroneously admitted victim-impact testimony at both phases of the trial.

### A. Victim-Impact Testimony

¶242. Addressing the latter claim first, the State points out that Clark never objected to improper victim-impact testimony at sentencing. And when the State offered Fahd's written

83

victim-impact statement into evidence, defense counsel stated, "I know that, as we discussed earlier under that victim-impact law, I think that he's entitled to do that."

¶243. Clark argues, however, that his pretrial motion seeking to prohibit all victim-impact testimony that did not relate to a statutory aggravator preserved his claim that Fahd's sentencing-phase testimony and letter about the loss of his son were improperly admitted.

¶244. But the State contends that this Court rejected the same argument in ***Moffett v. State***, 49 So. 3d 1073, 1106 (Miss. 2010):

> Here, the pretrial issue was whether victim-impact statements ("VIS") should be prohibited as a matter of law, not whether a particular question is objectionable or the answer admissible. If all VIS were prohibited, all questions and answers would be inadmissible. However, since VIS are not prohibited, only questions and answers deemed by caselaw and the rules are inadmissible. We find ***Goff*** [***v. State***, 14 So. 3d 625 (Miss. 2009)] inapplicable. The only issue preserved for appeal is whether VIS in their entirety are prohibited. The answer to that question is clearly no.

¶245. We agree with the State that despite the pretrial motion, the victim-impact claim is still barred from review for Clark's failure to object to any specific substance of it. Procedural bar notwithstanding, however, we also agree with the State that there is no merit to the claim.

¶246. The Supreme Court has held,

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." ***Booth*** [***v. Maryland***], 482 U.S. [496], 517, 107 S. Ct. [2529], 2540[, 96 L. Ed. 2d 440 (1987)] (WHITE, J.,

84

dissenting) (citation omitted). By turning the victim into a "faceless stranger at the penalty phase of a capital trial," [*South Carolina v.*] *Gathers*, 490 U.S. [805], 821, 109 S. Ct. [2207], 2216, [104 L. Ed. 2d 876] (O'CONNOR, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

*Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), *overruling Booth*, 482 U.S. 496. Accordingly, this Court has rejected the claim that victim-impact testimony must solely relate to a statutory aggravating circumstance to be admissible. *Keller*, 138 So. 3d at 865. And we again reject the claim here.

## B. Medical Examiner

¶247. The defense asserted a Confrontation Clause violation at trial because another pathologist conducted Muhammed's autopsy. The trial court allowed the State to voir dire Dr. Brently Davis outside the jury's presence. Dr. Davis testified that Dr. Erin Barhhart conducted the autopsy when she was employed with the crime lab, but she was no longer employed by the crime lab at the time of trial. Dr. Davis signed the autopsy report as a technical reviewer "indicating that [he] reviewed the case, the information, and agreed with her cause and manner of death." He explained the common practice in the medical examiner's office of physicians reviewing autopsies performed by their colleagues as follows:

> At the time in our office we reviewed every homicide and every death in custody so we have a packet and when the document is handed to the physician I start by reviewing images taken of the autopsy which would include radiographic images and then I review the report and care to my own conclusion and either I agree or disagree with Dr. Barnhart.

85

¶248. Dr. Davis testified that he was prepared to testify as to his own opinions, which were based on his own review and analysis of the file and that he reached his own conclusions "regardless of whatever conclusions Dr. Barnhart reached."

¶249. Dr. Davis agreed with the defense that had Dr. Barnhart not taken autopsy photographs or radiographs, he would have nothing to review and base an opinion on. When asked whether Dr. Barnhart determined what she should be photographing during the autopsy, Dr. Davis replied that their office sets standards for what is photographed during an autopsy. Dr. Davis testified that it was permissible in the field of forensic pathology to render an opinion on the cause and manner of death based on photographs and radiographs taken by another person.

¶250. Relying on *Christian v. State*, 207 So. 3d 1207 (Miss. 2016), the trial court ruled that Dr. Davis's giving his own opinion would not violate the Confrontation Clause. We find no error in the trial court's decision.

¶251. This Court rejected a similar claim in *Christian*. There, Dr. Barnhart was tendered as the pathology expert at the defendant's trial, although another pathologist, Dr. Adel Shaker, had performed the actual autopsy. *Christian*, 207 So. 3d at 1213. Dr. Shaker was no longer employed at the medical examiner's office at the time of trial. *Id.* Dr. Barnhart testified that she did not participate in any manner in the autopsy and that she never spoke with Dr. Shaker about the autopsy. *Id.* She did, however, examine the autopsy reports, along with the photographs and case notes, to form her own expert opinion. *Id.* Dr. Barnhart did not relay the actual content of Dr. Shaker's notes through her testimony, nor were Dr.

Shaker's notes ever admitted into evidence in the case. Thus this Court did not find that Dr. Barnhart "served as a mere conduit for the content of Dr. Shaker's notes[,]" *id.* at 1214, which was the concern in *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011).

¶252. Since Dr. Barnhart did not testify from the autopsy report or Dr. Shaker's notes, *Christian* found that no Confrontation Clause violation had occurred. *Christian*, 207 So. 3d at 1213.

¶253. Further, Justice Maxwell explained in his special concurrence in *Christian*:

> *Bullcoming* was "not a case in which an expert witness was asked for his *independent* opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.*, 564 U.S. at 673, 131 S. Ct. at 2722 (Sotomayor, J., concurring) (emphasis added). Instead, *Bullcoming* specifically concerned "surrogate testimony"—i.e., the prosecution's introduction of a forensic report containing a testimonial certification through the in-court testimony of a forensic analyst "who did not sign the certification or perform or observe the test reported in the certification." *Id.*, 564 U.S. at 651, 131 S. Ct. at 2710. In his separate opinion, Justice Kitchens assumes Dr. Barnhart was called to be a surrogate witness. But Dr. Barnhart was no surrogate. She was called as an expert witness to give her *independent* opinion about the cause of Carter's and Marks's deaths. *See Commonwealth v. Brown*, 139 A.3d 208, 217-19 (Pa. Super. Ct. 2016) (holding medical examiner's *independent* conclusions regarding the cause of death were admissible); *see also State v. Gonzales*, 274 P.3d 151, 158-59 (N.M. Ct. App. 2012) (finding no per se Confrontation Clause violation by allowing one expert pathologist to testify based on information gathered in an autopsy performed by another pathologist). Thus, it is obvious *Bullcoming*'s surrogate-testimony prohibition was not violated here, since Dr. Barnhart did not testify from the autopsy report but instead gave her independent expert opinion about the cause of death.

*Id.* at 1224-25 (Maxwell, J., specially concurring).

87

¶254. Here, Dr. Davis did not testify from Dr. Barnhart's autopsy report and conclusion(s) or provide surrogate testimony. Rather, he gave his own independent expert opinion about the cause of Muhammed's death. Thus, there was no Confrontation Clause violation.

¶255. But even if it were concluded that there was a Confrontation Clause violation, it is subject to harmless error. *See Conners v. State*, 92 So. 3d 676, 684 (Miss. 2012) ("Confrontation Clause violations are subject to harmless-error analysis.").

¶256. As the State points out, the undisputed proof at trial showed beyond a reasonable doubt that Clark shot Muhammed in the head, killing him. This was established by the surveillance video and Fahd's testimony. Accordingly, we find any error here to be harmless error beyond a reasonable doubt.

**VI.  Was the indictment constitutionally and statutorily sufficient to charge capital murder and/or to support imposition of a death sentence in the event of a conviction?**

¶257. Clark contends that his indictment charged armed robbery, but the State had the jury instructed, over his objection, on attempted robbery as the underlying felony. Clark submits that the crime of attempt in Mississippi has an element that the completed crime does not have, i.e., failure to complete the crime. Accordingly, the State elected to proceed on an uncharged offense for which it obtained a conviction.

¶258. Clark further claims the indictment is insufficient on its face because it failed to set forth with specificity all of the elements of robbery. Clark argues in his brief that robbery has two critical distinct elements, an intent to steal and the act of violence by which the theft was accomplished. He submits that robbery is analogous to burglary in that burglary also has

88

two critical distinct elements: "(1) the burglarious breaking and entering a dwelling, and (2) the felonious intent to commit some crime therein." *State v. Berryhill*, 703 So. 2d 250, 255 (Miss. 1997) (quoting *Moore v. State*, 344 So. 2d 731, 735 (Miss. 1977)). And this Court has held that a capital-murder charge arising out of burglary "require[s] the indictment to name the crime underlying the burglary in addition to tracking the capital murder statute." *Id.* at 256.

¶259. According to Clark, because the indictment failed to identify either the person or the property that was the object of the robbery or attempted robbery, it deprived Clark of notice and forced him to defend against evolving theories. Clark acknowledges that *Berryhill* recognized that, unlike burglary, when the underlying felony in a capital-murder charge is robbery, "a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient." *Id.* at 256 (citing *Mackbee v. State*, 575 So. 2d 16, 35 (Miss. 1990)). But he asks this Court to revisit that reasoning and extend the pleading requirements applicable to burglary-based capital felony murders to those based on robbery.

¶260. We decline to do so.

### A. Indictment and Instruction(s) to the Jury.

¶261. Clark's indictment charged him with capital murder as follows:

> Tony Terrell Clark and Teaonta Jymon Clark, on or about the 27th day of October, 2014, in the county aforesaid and within the jurisdiction of the this Court, did, without authority of law and with or without any design to effect death, kill and murder Muhammed Saeed, a human being, while the said Tony Terrell Clark and Teaonta Jymon Clark were then and there engaged in the commission of the crime of armed robbery, in violation of Miss. Code Ann. § 97-3-19(2)(e) (1972, as amended)[.]

89

¶262. The trial court granted the State's elements instruction for capital murder, which reads as follows:

> The defendant, Tony Terrell Clark, has been charged in Count I of the indictment in this case with the crime of Capital Murder.
>
> If you find from the evidence in this case, beyond a reasonable doubt that:
>
> 1. On or about the 27th day of October, 2014, in Madison County, Mississippi;
>
> 2. Tony Terrell Clark, did, without authority of law and with or without any design to effect death, kill and murder Muhammed Saeed, a human being,
>
> 3. While the said Tony Terrell Clark was then and there engaged in the commission of the crime of armed robbery,
>
> Then you shall find the defendant, Tony Terrell Clark guilty of Capital Murder, as charged in Count I of the indictment.

¶263. The trial court also granted the State's instruction defining armed robbery, which read as follows:

> The Court instructs the jury that if you believe from all the evidence in the case beyond a reasonable doubt that:
>
> 1. The defendant, Tony Terrell Clark, in Madison County, Mississippi, on or about October 27, 2014;
>
> 2. Did willfully, unlawfully, and feloniously, with the felonious intent to permanently deprive the owner thereof;
>
> 3. Did attempt to take, steal, and carry away currency;
>
> 4. Of Fahd Saeed from the presence of and against the will of the said Fahd Saeed;
>
> 5. By violence to his person with a deadly weapon;

90

then the same would constitute armed robbery as used elsewhere in these instructions.

¶264. Clark objected to the capital murder elements instruction because it initially included in element three the language "take or attempt to take, steal, and carry away currency." The defense argued that there was no testimony that Clark took currency, only that he attempted to take currency. The State agreed and removed the word "take" from the instruction.

¶265. Clark also objected to the instruction defining armed robbery, arguing that the indictment charged armed robbery, not attempted armed robbery. The trial court overruled the objection.

¶266. "The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense." *Goff*, 14 So. 3d at 665 (citing *Spicer v. State*, 921 So. 2d 292, 319 (Miss. 2006), *abrogated on other grounds by O'Connor v. State*, 120 So. 3d 390, 401-02 (Miss. 2013))). Indictments that fairly track the language of the controlling statute sufficiently place defendants on notice of the charges against which they must defend. *Batiste v. State*, 121 So. 3d 808, 836 (Miss. 2013). And elements instructions that accurately track the language of the statute, likewise, are legally sufficient. *Rubenstein v. State*, 941 So. 2d 735, 772 (Miss. 2006).

¶267. A jury instruction constructively amends an indictment if it "broaden[s] the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell*, 725 So. 2d at 855 (citing *United States v. Miller*, 471 U.S. 130, 105 S. Ct. 1811, 85 L. Ed. 2d 99 (1985)). A constructive amendment is per se reversible error "because the

91

defendant may have been convicted on a ground not charged in the indictment." *Id.* at 855-56 (quoting *United States v. Adams*, 778 F.2d 1117 (5th Cir. 1985)).

¶268. But, "[n]ot all variances between the indictment and instructions constitute a constructive amendment, nor do they rise to plain error. The central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Id.* at 855.

¶269. Mississippi Code Section 97-3-79 (Rev. 2020) defines the crime of armed robbery:

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . .

¶270. "[I]n Mississippi *both an attempt to take and an actual taking* of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery." *Harris*, 445 So. 2d at 1370.

¶271. Here, we find only an immaterial variance between the complained-of jury instruction and Clark's indictment. If the jury found that Clark actually took the property, he was guilty of robbery. If the jury found that Clark only attempted to take the property, he was guilty of robbery. As such, the variance between the indictment and the jury instructions did not substantially alter the elements of proof necessary for a conviction of armed robbery.

> **B.** *Berryhill* **reasoning**

92

¶272. Clark's request that this Court extend the pleading requirements applicable to burglary-based capital felony murders to those based on robbery was presented to this Court in *Batiste*, 121 So. 3d 808. *Batiste* related *Berryhill* as follows:

> The level of notice that would reasonably enable a defendant to defend himself against a capital murder charge that is predicated upon burglary must, to be fair, include notice of the crime comprising the burglary. Burglary is unlike robbery and all the other capital murder predicate felonies in that it requires as an essential element the intent to commit another crime. While it is true that the general rule finds indictments that track the language of the criminal statute to be sufficient, the fairer rule in case of capital murder arising out of burglary . . . would require the indictment to name the crime underlying the burglary in addition to tracking the capital murder statute.
>
> . . . .
>
> As the facts in this case demonstrate, a defendant such as Berryhill who has been indicted without specifying the burglary may find out on the eve of trial that the State might try to prove the burglary on different theories. Needless to say, different theories would plainly invite different defenses. Such "trial by ambush" is at odds with this Court's jurisprudence on the need for an indictment to give enough notice for a defendant to prepare a defense.
>
> The second reason that we hold that murder indictments made capital must specify the nature of the underlying burglary is predicated upon the well-settled law that a defendant cannot be put in jeopardy for crimes except those which a grand jury of his peers has presented.

*Batiste*, 121 So. 3d at 837 (alterations in original) (quoting *Berryhill*, 703 So. 2d at 255-57).

¶273. *Batiste* declined the same request that Clark requests here. *Batiste* explained as follows:

> While burglary requires an essential element the intent to commit some specific crime, a defendant is guilty of robbery if the State proves he feloniously took another's personal property by force or by putting that person in fear, no matter what the property was. Miss. Code Ann. § 97-3-73 (Rev. 2006). We find that Batiste has put forth no compelling reason to expand

93

*Berryhill*'s holding to require that a capital-murder indictment predicated on robbery list the object taken.

*Id.* at 838.

¶274. Likewise, we find no compelling reason here to expand *Berryhill*'s holding to require that a capital-murder indictment predicated on robbery list the object taken.

¶275. Further, in *Carson v. State*, this Court held that the identity of the victim of an underlying armed robbery is not an element of the offense of capital murder that must be stated in the capital-murder indictment. *Carson v. State*, 212 So. 3d at 22, 33-34 (Miss. 2016), *overruling* *Rowland v. State*, 98 So. 3d 1032 (Miss. 2012). Accordingly, Clark's indictment was not required to identify the person who was the object of the underlying armed robbery.

### VII. Is the death sentence in this matter constitutionally and statutorily disproportionate?

¶276. Mississippi Code Section 99-19-105(3) requires that this Court undertake review of the following matters when a death sentence is imposed:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating

94

circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3) (Rev. 2020).

¶277. Further, Section 99-19-105(5) provides:

(5)     The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(a)     Affirm the sentence of death;

(b)     Reweigh the remaining aggravating circumstances against the mitigating circumstances should one or more of the aggravating circumstances be found to be invalid, and (i) affirm the sentence of death or (ii) hold the error in the sentence phase harmless error and affirm the sentence of death or (iii) remand the case for a new sentencing hearing; or

(c)     Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.

Miss. Code Ann. § 99-19-105(5) (Rev. 2020).

¶278. Clark contends that most capital murders premised on killings during armed robberies in this State are not ordinarily prosecuted for the death penalty. He submits that the death penalty has only been sought in Madison County one other time in last fourteen years, and this is the only case in which it has been imposed since 1994.

¶279. Clark argues that arbitrariness in seeking or obtaining death sentences "in only a tiny portion of cases" has been noted as being of particular concern as a proportionality issue in Mississippi, where the felony murder statute permits a death sentence even for unintentional homicides, and the sentencing statute permits the imposition of that sentence simply for

having actually killed the victim, however unintentionally.  Miss. Code Ann §§ 97-3-19(2)(e), 99-19-101(7)(a) (Rev. 2020).

¶280.  Clark quotes Justice Breyer's dissent in *Jordan v. Mississippi*:

> Mississippi is one of a small number of States in which defendants may be (and, in Mississippi's Second Circuit Court District, routinely are) sentenced to death for, among other things, felony robbery murder without any finding or proof of intent to kill.  Pet. for Cert. in No. 17-7245, at 4-5, and nn.3-4; see also *id.*, at 8, n. 10; Miss. Code Ann. §§ 97-3-19(2)(e), (f ), 99-19-101(5)(d) (2017); McCord & Harmon, Lethal Rejection: An Empirical Analysis of the Astonishing Plunge in Death Sentences in the United States From Their Post-Furman Peak, 81 Albany L. Rev. 1, 32-33, and n.155, Table 10 (2018) (citing data indicating the general decline in robbery as an aggravating factor and research arguing that relying upon robbery as a sole aggravator is generally insufficient to identify the "worst of the worst").

*Jordan v. Mississippi*, 138 S. Ct. 2567, 2569-70, 201 L. Ed. 2d 1104 (2018) (Breyer, J., dissenting from the denial of certiorari):

¶281.  Clark acknowledges that Section 99-19-105 does not require that death sentences be compared with cases in which death was not imposed for purposes of proportionality review or even in reviewing whether the sentence was imposed arbitrarily.  Miss. Code Ann. § 99-19-105 (Rev. 2020).  Clark contends, however, that the Eighth Amendment does require it.  Clark submits that this Court should not ignore this troubling arbitrariness in how and when the death penalty is actually sought and imposed.  To do so, according to Clark, is to ignore "the fundamental respect for humanity underlying the Eighth Amendment[.]"  *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).  Clark argues that his death sentence should be vacated as disproportionate and arbitrarily imposed and replaced with a sentence of life.

¶282. Clark essentially presents an equal-protection argument similar to the one presented in *Galloway v. State*, 122 So. 3d 614 (Miss. 2013). There, the defendant argued that Mississippi lacks statewide standards governing the discretion of local prosecutors to seek or decline to seek the execution of death-eligible defendants. *Id.* at 681. As a result, the decision whether to seek the death penalty turns on personal policies of the local prosecutor. *Id.* (internal quotations marks omitted). Thus, Mississippi fails to provide even an "abstract proposition" or "starting principle" as to how local prosecutors should make these life-and-death decisions. *Id.*

¶283. As we explained in *Galloway*, "this Court and the Supreme Court repeatedly have rejected this type of argument." *Id.* (citing *McCleskey v. Kemp*, 481 U.S. 279, 296-97, 107 S. Ct. 1756 95 L. Ed. 2d 262 (1987); *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Jordan v. State*, 918 So. 2d 636, 658-59 (Miss. 2005)). Decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional. *See Gregg*, 428 U.S. at 199, 96 S. Ct. 2909 ("Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution."); *Jordan*, 918 So. 2d at 658-59 (there is no constitutional requirement that all equally culpable defendants receive the same punishment).

> "Discretion in the criminal justice system offers substantial benefits to the criminal defendant." *McCleskey*, 481 U.S. at 311, 107 S. Ct. 1756. The local prosecutor "can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case." *Id.* at 312, 107 S. Ct. 1756. With that power of leniency is the power also to discriminate. *Id.* But "a capital punishment system that did not allow for discretionary acts of leniency 'would be totally alien to our notions of criminal justice.'" *Id.* (quoting *Gregg*, 428 U.S. at 200 n.50, 96 S. Ct. 2909).

*Galloway*, 122 So. 3d at 681.

¶284. Further, this Court has repeatedly found that death sentences are not disproportionate to capital murders with underlying armed robberies.

> As pointed out by the State, the Court, in similar capital-murder cases in which robbery was the underlying felony, has established that a sentence of death is not disproportionate. *See Goff*, 14 So. 3d at 670 (¶ 207) (recognizing that "[t]his Court has upheld the death penalty in cases involving capital murders during the commission of a robbery"); *Doss v. State*, 709 So. 2d 369, 400 (¶ 135) (Miss. 1996) (upholding sentence of death where defendant was convicted of capital murder in the commission of a robbery for shooting death of store clerk); *Davis v. State*, 660 So. 2d 1228, 1261 (Miss. 1995) (upholding sentence of death in capital murder in the commission of a robbery); *Stringer v. State*, 454 So. 2d 468, 479 (Miss. 1984) (affirming sentence of death for capital murder in the commission of a robbery even though defendant was not the shooter).

*Keller*, 138 So. 3d at 876.

¶285. Here, we do not find that Clark's death sentence is either excessive or disproportionate. Nor do we find that Clark's death sentence was the result of passion, prejudice, or any other arbitrary factor. And as already discussed, evidence was presented that supports the jury's determination that the murder was committed for the purpose of avoiding or preventing a lawful arrest and for pecuniary gain—two aggravating circumstances enumerated in Section 99-19-101.

### VIII. Does the cumulative effect of the errors in the trial court require reversal of all convictions and vacating all sentences imposed?

¶286. Clark submits that this case contains cumulative error warranting reversal of his conviction and sentence.

¶287. "This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that do not independently require a reversal." *Wilcher*, 863 So. 2d at 835-36. (citing *Jenkins*, 607 So. 2d at 1183-84). We have said that, "in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." *Moffett v. State*, 156 So. 3d 835, 871 (Miss. 2014) (internal quotation mark omitted) (quoting *Wilcher*, 863 So. 2d at 836).

¶288. Having reviewed the record and arguments, we find no individual errors that require reversal or aggregation of errors that, as a whole, would mandate a reversal of Clark's conviction or sentence. Accordingly, this issue is without merit.

## CONCLUSION

¶289. We affirm Clark's conviction and sentence.

¶290. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.**

99

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Alberto Julio Garcia v. State*, 300 So. 3d 945 (Miss. 2020).

*Abdur Rahim Ambrose v. State*, 254 So. 3d 77 (Miss. 2018).

*Curtis Giovanni Flowers v. State*, 240 So. 3d 1082 (Miss. 2017), *rev'd and remanded*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

*Timothy Nelson Evans v. State*, 226 So. 3d 1 (Miss. 2017).

*James Cobb Hutto III v. State*, 227 So. 3d 963 (Miss. 2017).

*David Cox v. State*, 183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014), *vacated and remanded*, 136 S. Ct. 2157, 195 L. Ed. 2d 817 (2016).

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *leave to seek PCR granted in part and denied in part*, 255 So. 3d 99 (Miss. 2017).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014), *leave to seek PCR granted in part and denied in part*, 229 So. 3d 715 (Miss. 2017).

*Leslie Galloway v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So. 3d 808 (Miss. 2013), *leave to seek PCR granted*, 184 So. 3d 290 (Miss. 2016).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Eric Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Terry Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Joseph Bishop Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*William Matthew Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Lisa Jo Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Thomas Edwin Loden Jr. v. State*, 971 So. 2d 548 (Miss. 2007).

*Mack Arthur King v. State*, 960 So. 2d 413 (Miss. 2007), *on remand from* 784 So. 2d 884 (Miss. 2001), *on remand from* 656 So. 2d 1168 (Miss. 1995), *on remand from* 421 So. 2d 1009 (Miss. 1982).

*Devin A. Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Jeffrey Keith Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Fred Sanford Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Quintez Wren Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Derrick Demond Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Thong Le v. State*, 913 So. 2d 913 (Miss. 2005), *leave to seek PCR denied*, 967 So. 2d 627 (Miss. 2007), *leave to seek second PCR granted*, 2013-DR-00327-SCT (Miss. Jan. 26, 2016).

*Xavier Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Stephen Elliot Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Lawrence Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Kevin Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Leroy Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Kelvin Dycus v. State*, 875 So. 2d 140 (Miss. 2004), *vacated and remanded*, 544 U.S. 901, 125 S. Ct. 1589, 161 L. Ed. 2d 271 (2005).

*Michelle Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Marlon Latodd Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Eddie Lee Howard Jr. v. State*, 853 So. 2d 781 (Miss. 2003).

***Linnox Marcus Walker v. State***, 815 So. 2d 1209 (Miss. 2002), *on remand from* 740 So. 2d 873 (Miss. 1999).

***Dale Leo Bishop v. State****,* 812 So. 2d 934 (Miss. 2002).

***Benny Joe Stevens v. State***, 806 So. 2d 1031 (Miss. 2002).

***Blayde Grayson v. State***, 806 So. 2d 241 (Miss. 2002).

***Steve Knox v. State***, 805 So. 2d 527 (Miss. 2002).

***Gary Carl Simmons Jr. v. State***, 805 So. 2d 452 (Miss. 2002).

***Earl Wesley Berry v. State***, 802 So. 2d 1033 (Miss. 2001).

***Eric Snow v. State***,  800 So. 2d 472 (Miss. 2001).

***William Gerald Mitchell v. State***, 792 So. 2d 192 (Miss. 2001).

***Larry Matthew Puckett v. State***, 788 So. 2d 752 (Miss. 2001), *on remand from* 737 So. 2d 322 (Miss. 1999).

***Howard Goodin v. State***,  787 So. 2d 639 (Miss. 2001).

***Richard Gerald Jordan v. State***, 786 So. 2d 987 (Miss. 2001).

***Willie Jerome Manning v. State***, 765 So. 2d 516 (Miss. 2000), *on remand from* 735 So. 2d 323 (Miss. 1999).

***Roderick Eskridge v. State***, 765 So. 2d 508 (Miss. 2000).

***Stephen Virgil McGilberry v. State***, 741 So. 2d 894 (Miss. 1999)***.***

***William Ray Hughes v. State***, 735 So. 2d 238 (Miss. 1999).

***Edwin Hart Turner v. State***, 732 So. 2d 937 (Miss. 1999).

***Clyde Wendell Smith v. State***, 729 So. 2d 1191 (Miss. 1998).

***Joseph Daniel Burns v. State***, 729 So. 2d 203 (Miss. 1998).

***Kelvin Jordan v. State***, 728 So. 2d 1088 (Miss. 1998).

*Rodney Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Willie Jerome Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Paul Everette Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Frederick Bell v. State*, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

*Donald Leroy Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Kennedy Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Charles Ray Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Anthony Jones Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Justin Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Gerald James Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Mack C. Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Bobby Glen Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*William L. Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Sherwood Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Robert Simon Jr. v. State*, 688 So. 2d 791 (Miss. 1997).

*Henry Curtis Jackson Jr. v. State*, 684 So. 2d 1213 (Miss. 1996).

*Jessie Derrell Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Jeffrey Keller Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Eddie Lee Taylor Jr. v. State*, 682 So. 2d. 359 (Miss. 1996).

*Joseph Patrick Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*David Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*William Joseph Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Alan Dale Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Willie Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Vernice Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Kenneth L. Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Anthony Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Jimmie Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Ricky Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Ronald Chris Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Ronnie Lee Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Tracy Alan Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*Robert Lee Shell v. State*, 554 So. 2d 887 (Miss. 1989), *rev'd and remanded*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990).

*Gregory Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Robert S. Minnick v. State*, 551 So. 2d 77 (Miss. 1989), *rev'd and remanded*, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990).

*Bobby Joe Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *vacated and remanded*, 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990).

*Chandler Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *vacated and remanded*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990).

*Paul Everette Woodward v. State*, 533 So. 2d 418 (Miss. 1988), *vacated and remanded*, 635 So. 2d 805 (Miss. 1993).

*John B. Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*West Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Carl Daniel Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Carl Daniel Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Lazaro Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*Gregory Montecarlo Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *vacated and remanded*, 487 U.S. 1230, 108 S. Ct. 2891, 101 L. Ed. 2d 925 (1988).

*William L. Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Samuel Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*David Randolph Gray v. State*, 472 So. 2d 409 (Miss. 1985), *rev'd and remanded*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).

*Frank J. Cabello Sr. v. State*, 471 So. 2d 332 (Miss. 1985).

*Richard Gerald Jordan v. State*, 464 So. 2d 475 (Miss. 1985), *vacated and remanded*, 476 U.S. 1101, 106 S. Ct. 1942, 90 L. Ed. 2d 352 (1986).

*Bobby Glen Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*James E. Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*James R. Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Donald William Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Howard Monteville Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*John Earl Booker v. State*, 449 So. 2d 209 (Miss. 1984), *vacated and remanded*, 472 U.S. 1023, 105 S. Ct. 3493, 87 L. Ed. 2d 626 (1985), *sentence aff'd*, 511 So. 2d 1329 (Miss. 1987).

*Bobby Glen Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Bobby Caldwell v. State*, 443 So. 2d 806 (Miss. 1983), *rev'd and remanded*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), *sentence aff'd*, 481 So. 2d 850 (Miss. 1985), *vacated and remanded*, 479 U.S. 1075, 107 S. Ct. 1269, 94 L. Ed. 2d 130 (1987), *sentence aff'd*, 517 So. 2d 1360 (Miss. 1987).

*John Buford Irving III v. State*, 441 So. 2d 846 (Miss. 1983).

*George David Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Michael Dale Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Alvin Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Marion Albert Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Robert C. Gilliard Jr. v. State*, 428 So. 2d 576 (Miss. 1983).

*Connie Ray Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Willie Albert Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Edward Earl Johnson v. State*, 416 So. 2d 383 (Miss. 1982).

*Leo E. Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Crawford Bullock Jr. v. State*, 391 So. 2d 601 (Miss. 1980).

*Willie N. Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Larry Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Alvin Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Jimmie Lee Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Richard Gerald Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Jimmy Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*John Buford Irving III v. State*, 361 So. 2d 1360 (Miss. 1978).

*Johnny Lewis Washington v. State*, 361 So. 2d 61 (Miss. 1978).

*Charles S. Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Curtis Giovanni Flowers v. State*, 287 So. 3d 905 (Miss. 2019), *on remand from* 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

*Justin Barrett Blakeney v. State*, 236 So. 3d 11 (Miss. 2017).

Order, *Sherwood Brown v. State*, No. 2017-DR-00206-SCT (Miss. Oct. 26, 2017).

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss. 2015).

*Willie Jerome Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

Order, *Michelle Byrom v. State*, No. 2014-DR-00230-SCT (Miss. Apr. 4, 2014).

*Charles Wayne Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Curtis Giovanni Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Curtis Giovanni Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

*Armon Andre Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Curtis Giovanni Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Frontrail Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Terry Ray Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Danny Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Bryan Joseph Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Rickey Lynn Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Eric Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Eddie Lee Howard Jr. v. State*, 701 So. 2d 274 (Miss. 1997).

*Gerry Lynn Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Calvin Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Arthur Ray Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*William Giles Jr. v. State*, 650 So. 2d 846 (Miss. 1995).

*David W. Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Henry Lee Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Sabrina Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*William Wayne Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Donald Ray Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Susie Ann Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Robert S. Minnick v. State*, 573 So. 2d 792 (Miss. 1991), *on remand from* 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990).

*Gary Lynn Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Randy Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*Othie Lee West v. State*, 553 So. 2d 8 (Miss. 1989).

*Alfred Dale Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Bart Helgrin Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Judy Lane Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*Samuel Tony West v. State*, 519 So. 2d 418 (Miss. 1988).

*Danny Ray Davis v. State*, 512 So. 2d 1291 (Miss. 1987).

*Cecilia Ann Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*James Henry Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Grady Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*Othie Lee West v. State*, 485 So. 2d 681 (Miss. 1985).

*Larry R. Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Leon Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Eric S. Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*Tony Wells West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Gregory Montecarlo Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*James Vincent Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Arthur Ray Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Waddell Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Frederick Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Kelvin Dycus v. State*, 910 So. 2d 1100 (Miss. 2005), *on remand from* 544 U.S. 901, 125 S. Ct. 1589, 161 L. Ed. 2d 271 (2005).

*Willie N. Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Noah Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*Willie Lee White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Crawford Bullock Jr. v. State*, 525 So. 2d 764 (Miss. 1987).

*Hezekiah Edwards v. State*, 441 So. 2d 84 (Miss. 1983).

*Earl Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Stanley Kelvin Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*Kristi Lee Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Alan Michael Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*Linnox Marcus Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*James Earnest Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*Tracy Lee West v. State*, 725 So. 2d 872 (Miss. 1998).

*Jerome Pete Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Earl Wesley Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*John Earl Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*C.W. Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*Paul Everette Woodward*, 635 So. 2d 805 (Miss. 1993), *on remand from* 533 So. 2d 418 (Miss. 1988).

*Robert Lee Shell v. State* 595 So. 2d 1323 (Miss. 1992), *on remand from* 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990).

*Bobby Joe Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992), *on remand from* 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990).

*Chandler Clemons v. State*, 593 So. 2d 1004 (Miss. 1992), *on remand from* 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990).

*Gregory Montecarlo Jones v. State*, 602 So. 2d 1170 (Miss. 1992), *on remand from* 487 U.S. 1230, 108 S. Ct. 2891, 101 L. Ed. 2d 925 (1988).

*Willie Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Gerald James Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Michael Warren Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Jeffrey Joseph Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Frank Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Earl Wesley Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Kevin Lewis Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. George David Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Samuel Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Jessie Derrell Williams v. State*, 544 So. 2d 782 (Miss. 1989), *sentence aff'd*, 684 So. 2d 1179 (1996).

*Johnny Rufus Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Richard Gerald Jordan*, 518 So. 2d 1186 (Miss. 1987), *on remand from* 476 U.S. 1101, 106 S. Ct. 1942, 90 L. Ed. 2d 352 (1986).

*Jimmy Michael Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Adam Lee Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*James Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Attina Marie Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*William Wiley v. State*, 449 So. 2d 756 (Miss. 1984), *aff'd*, 484 So. 2d 339 (Miss. 1986), *vacated and remanded for resentencing*, 635 So. 2d 802 (Miss. 1993), *writ of habeas corpus issued sub nom. Wiley v. Puckett*, 969 F.2d 86 (5th Cir. 1992), *resentencing aff'd sub nom Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Walter Williams Jr. v. State*, 445 So. 2d 798 (Miss. 1984).

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶291. I respectfully dissent, and I join the dissent of Presiding Justice King. I write separately to express my disagreement with the majority's determination that no further instruction was needed when the jury communicated to the court that it was unable to reach unanimity, requesting specifically that it be told the consequence of its failure to agree on punishment. The trial court left the jury without guidance on the applicable law, which provides that, if the jury cannot reach a unanimous decision on punishment within a reasonable time, then the judge will sentence the defendant to life without parole. Miss. Code Ann. § 99-19-103 (Rev. 2020); Miss. Code Ann. § 47-7-3(1)(c)(i) (Supp. 2021). Without this crucial information, the jurors were left to speculate on the effect of their failure to reach unanimity. The jurors might have imagined that if they did not agree on punishment unanimously, the sentencing phase would end in a mistrial and would be retried before a different jury or that the defendant would be given a parole-eligible sentence. Such incorrect speculation could have prompted a holdout juror to agree with the others and vote for the death penalty, infecting the decision-making process with arbitrariness. A capital sentencing decision, in which jurors are asked to choose between life and death for another citizen, may be the gravest decision that a person ever will make. Guessing about the applicable law should never be a component of a jury's capital sentencing deliberations. Such an endeavor runs afoul of a defendant's right to a fair trial. Accordingly, I would hold that Clark is entitled to a new sentencing trial before a fully instructed jury.

113

¶292. Clark's jury was instructed on three sentencing options. First, it unanimously could condemn Clark to death. Another possible verdict was "We, the jury, find that the Defendant should be sentenced to life imprisonment without eligibility for parole." The third option was "We, the jury, are unable to agree unanimously on punishment." The record reflects that the jury engaged in a lengthy deliberation process. The jury began deliberations at 6:00 p.m. At 10:00 p.m., the trial court recessed. At 9:00 a.m. the next day, the jury resumed deliberations. At 10:34 a.m., the jury sent out a note that said the following: "We are currently unable to agree unanimously on punishment. Question. What normally happens if we choose Option 3? Realistically, what happens?"

¶293. The trial court heard argument from Clark and from the State on how to respond to the jury's question. Clark argued that the jury had exceeded a reasonable time for deliberations and that the trial court should dismiss the jury and impose a sentence of life without parole. The trial court found that the jury's deliberations had not exceeded a reasonable time. Clark then requested that the jury be instructed that the consequence of its failure to reach unanimity would be that the trial court imposes a sentence of life without parole. Clark had requested such an instruction at the instruction conference, but the trial court had refused the instruction.[8] The trial court denied Clark's request to provide an answer to the jury's question and instead sent a note to the jury saying, "It is not something that you

---

[8] The requested instruction, D-31, stated, "If you cannot, within a reasonable time, agree as to punishment, I will dismiss you and impose a sentence of life imprisonment without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this."

should consider during your deliberations." At 2:00 p.m., the jury reached a verdict sentencing Clark to death. A poll of the jury revealed that the verdict was unanimous.

¶294. The majority and the State acknowledge that Instruction D-31 does state the applicable law correctly. Therefore, the tendered instruction met a bedrock requirement of this Court's jury instruction jurisprudence, which is that jury instructions must state the law correctly. "Jury instructions must fairly announce the law of the case and not create an injustice against the defendant." *Sharkey v. State*, 265 So. 3d 151, 156 (Miss. 2019) (citing *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001)). "[T]he court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Valentine v. State*, 322 So. 3d 417, 423 (Miss. 2021) (internal quotation mark omitted) (quoting *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012)).

¶295. This Court has adopted a position that, even though an instruction such as the one requested by Clark indeed is a correct statement of the law, such an instruction is not allowed. In refusing Clark's request to instruct the jury that if it could not reach unanimity, Clark would be sentenced to imprisonment for life without parole, the trial court relied on a series of cases in which this Court has held that such an instruction is improper. *Flowers v. State*, 240 So. 3d 1082, 1142-43 (Miss. 2017), *reversed and remanded on other grounds by Flowers v. Mississippi*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019); *Cox v. State*, 183 So. 3d 36, 57 (Miss. 2015); *Dickerson v. State*, 175 So. 3d 8, 25-26 (Miss. 2015); *Ronk v. State*, 172 So. 3d 1112, 1141-42 (Miss. 2015); *Corrothers v. State*, 148 So. 3d 278, 317-18 (Miss. 2014); *Gillett v. State*, 56 So. 3d 469, 515-16 (Miss. 2010); *Moffett v. State*, 49 So. 3d 1073,

111 (Miss. 2010); *Pitchford v. State*, 45 So. 3d 216, 255 (Miss. 2010); *Edwards v. State*, 737 So. 2d 275, 316-17 (Miss. 1999); *Stringer v. State*, 500 So. 2d 928, 945 (Miss. 1986). The majority relies on that line of cases as well. In *Wilcher v. State*, 697 So. 2d 1123, 1136 (Miss. 1997), the Court held that, because Section 99-19-103 leaves to the Court, not to the jury, the determination of what constitutes a reasonable time for deliberations, it would have been error to instruct the jury on the reasonable time requirement. But *Wilcher* does not explain satisfactorily why the rest of the instruction is impermissible; that is, why the jury cannot be told that, if it does not reach unanimity, the trial court will sentence the defendant to life without parole. Nor do the other cases provide a satisfactory explanation. Instead, the cases hold that no instruction on the consequence of unanimity is required when the jury is instructed fully on the three options for punishment in the sentencing phase, including failure to reach unanimity. *See, e.g.*, *Gillett*, 56 So. 3d at 515-16. But instructing the jury that it does not have to reach unanimity is not the same thing as instructing it on the *consequence* of its not reaching unanimity. Without an instruction on the consequence of non-unanimity, the jury instructions create an injustice by not "fairly announc[ing] the law of the case[.]" *Sharkey*, 265 So. 3d at 156 (citing *Milano*, 790 So. 2d at 184).

¶296. I believe the time has come for this Court to revisit its stance on concealing the consequence of non-unanimity from the sentencing phase jury in a death penalty case. The note sent by Clark's jury is indicative of the jury's confusion about its sentencing instructions. Clearly, the trial court's instructing of Clark's jury on the three sentencing options was inadequate to inform it about the full consequences of its decision. If the jury

116

had been fully informed on the law, then it would not have paused its deliberations to ask, "What normally happens if we choose Option 3. Realistically, what happens?" The jury gave this indication that it had not decided on punishment, and it wanted to know what would happen to Clark if it could not reach unanimity. The majority approves of the jury's being kept in the dark and left to engage in guesswork and conjecture about the consequence of its not coming to unanimous agreement about the appropriate punishment for Clark.

¶297. In a similar case, the Supreme Court of Louisiana found that:

> Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial,[9] before another jury would be required.
>
> Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings. Consequently, by allowing the jurors to remain ignorant of the true consequences of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action. The death penalty was imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.
>
> . . . .
>
> The effect of the error here involved was in all likelihood prejudicial. If only one of the twelve jurors was swayed by the failure to inform him fully of the consequence of his sentence recommendation, then, in the absence of that error, the death penalty would not have been imposed.

*State v. Williams*, 392 So. 2d 619, 634-35 (La. 1980).

---

[9] Clark's jury was instructed that if it could not reach a unanimous verdict in the sentencing phase, its verdict in the guilt phase would be unaffected. But it was not instructed on any other consequences of a failure to reach unanimity on punishment.

¶298. In *State v. Jones*, 474 So. 2d 919, 936 (La. 1985), the Supreme Court of Louisiana held that, when the jury indicates that it might not be able to reach unanimity, the trial court must give an instruction that if the jurors fail to agree, the trial court will impose a sentence of life without parole. If the jury indicates they cannot agree and the trial court does not so instruct the jury, the possibility that the verdict was the result of prejudicial jury confusion mandates reversal. *Id.* Only if "there [is] no indication that the jury [could not] agree unanimously" will the court affirm when the instruction was not given. *Id.* The Louisiana Supreme Court noted that "the trial judge may always give such an instruction at the outset in order to avoid the possibility of prejudice." *Id.* at n.17.

> [T]he prudent course for the trial judge is to give an outset instruction that the jury's failure to agree unanimously will result in an automatic sentence of life imprisonment without parole, while at the same time instructing the jury of its duty to deliberate diligently with the view of reaching a unanimous recommendation if at all possible.

*Id.* (citing *State v. Loyd*, 459 So. 2d 498 (La. 1984) (Lemmon, J., concurring)).

¶299. I would hold that a Mississippi jury undertaking to determine whether a capital defendant should suffer the death penalty or be sentenced to life without parole should be instructed that, if it cannot reach unanimity, the trial court will sentence the defendant to life without parole. The practice of withholding the relevant law from the sentencer injects arbitrariness into that most important of sentencing decisions, the choice between life and death. This Court requires that trial judges know the law applicable to their sentencing decisions. *Wells v. State*, 160 So. 3d 1136, 1146 (Miss. 2015), *overruled on other grounds by Rowsey v. State*, 188 So. 3d 486 (Miss. 2016). A competent trial judge will be aware of

the consequences of each available sentencing choice, including eligibility for parole or early release. Why should jurors be deprived of that knowledge when they are in the position of a judge with regard to determining the sentence to be imposed? Trial judges must know the ramifications of their sentencing decisions. When the jury is the sentencer, it likewise should be fully informed.

¶300. Under the doctrine of *stare decisis*, it is only when this Court determines that "the law as it stands is pernicious, impractical, or mischievous in its effect" and "result[s] in a detriment to the public" that may we depart from prior decisions. ***Caves v. Yarbrough***, 991 So. 2d 142, 152 (Miss. 2008) (quoting ***Smith v. State***, 839 So. 2d 489, 495 (Miss. 2003)). Article 3, section 14, of the Mississippi Constitution provides criminal defendants a due process right to a fair trial. Miss. Const. Art. 3, § 14. A jury without knowledge of the consequences of its failure to reach unanimity is not a fully informed jury. This lack of knowledge invites the jurors to speculate and guess about life or death decisions. Because withholding from the jury any instruction on the consequence of non-unanimity impacts a death-eligible defendant's state constitutional right to a fair trial, our existing law barring that instruction is pernicious, mischievous, and should be corrected.

¶301. Clark's sentencing jury was charged with determining whether Clark lives or dies. Yet missing from the jurors' deliberations was the knowledge of what would occur if they could not reach unanimity. The jury's note establishes that, at one point during deliberations, the jurors had not reached unanimity and that some of the jurors wondered what would happen if they could not do so. The trial court's reply to the jury's inquiry, telling it not to consider

119

the consequence of non-unanimity, left the jury to speculate on the consequence, a matter about which it obviously was quite concerned. In the absence of judicial instruction, individual jurors may have believed, erroneously, that if they did not join with others in voting for death, another sentencing jury would be convened or that Clark would receive a sentence that included parole or early release. To avoid the pernicious danger of juror speculation, Clark's jury should have been told the whole truth and given an honest answer to its question. I would reverse and remand for a new trial at which the jury is instructed in accordance with Mississippi Code Section 99-19-103 that, if it fails to reach unanimity, the trial court will sentence the defendant to life without parole.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶302. The trial court violated Clark's and the jurors' Fourteenth Amendment right to be free of racial discrimination by failing to find that a ***Batson***[10] violation occurred during the jury selection process. I therefore dissent from the majority's conclusion that the trial court did not err by denying Clark's ***Batson*** challenges. I also dissent from the majority's determination that no further jury instruction was necessary when the jury could not reach agreement, and I therefore join Presiding Justice Kitchens's well-reasoned dissent.

*1.* ***Batson***

¶303. "[A] State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." ***Flowers v. Mississippi***, 139 S. Ct.

---

[10]***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

2228, 2234, 204 L. Ed. 2d 638 (2019) (citing *Batson*, 476 U.S. 79). "Other than voting,

serving on a jury is the most substantial opportunity that most citizens have to participate in

the democratic process." *Flowers*, 139 S. Ct. at 2238. "Equal justice under law requires a

criminal trial free of racial discrimination in the jury selection process." *Id.* at 2242. "*Batson*

sought to protect the rights of defendants and jurors, and to enhance public confidence in the

fairness of the criminal justice system." *Id.* Consequently, "[t]he Constitution forbids

striking even a single prospective juror for a discriminatory purpose." *Id.* at 2244 (citing

*Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016).

¶304. To demonstrate a *Batson* violation, a defendant first must make a prima facie case that

the strikes were motivated by discrimination. *Batson*, 476 U.S. at 96-97. The trial court in

this case determined that Clark made a prima facie case of discrimination. The prosecutor

then must provide race-neutral reasons for the strikes. *Id.* at 97-98. Third, the trial court

determines whether the defendant has met his burden of proving that the reasons given by

the prosecutor were a pretext for purposeful discrimination. *Id.* at 98.[11]

---

[11]The *Batson* hearings in this case were held on the spot during juror strikes, without giving Clark any opportunity to prepare. When Clark would point out other similar jurors for a comparative juror analysis, the court would ask for specifics, admitting that the court itself did not remember details of hundreds of jurors, and Clark's counsel replied, for example, "I would have to go back through. I don't have that information at hand." The trial court then did not give counsel the opportunity to go back through the questionnaires and testimony. Yet, despite the trial court not giving Clark time or opportunity to put forth exact and detailed comparisons, and despite Clark alleging at trial that similarities existed between struck black jurors and accepted white jurors, this Court holds Clark to an impossible standard of making a more detailed case than he did despite the trial court not allowing him to do so. Indeed, Clark does not introduce a comparative juror analysis for the first time on appeal. He was merely afforded the time to go into more detail regarding his already made comparative juror analysis on appeal, as the trial court did not allow him to do so.

¶305. Evidence relevant to whether a peremptory strike was made with discriminatory purpose includes: (1) "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case"; (2) "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case"; (3) "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case"; (4) "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing"; (5) "relevant history of the State's peremptory strikes in past cases"; and (6) "other relevant circumstances that bear upon the issue of racial discrimination." *Flowers*, 139 S. Ct. at 2243. "The trial court *must* consider the prosecutor's race-neutral explanations in light of *all* of the relevant facts and circumstances, and in light of the arguments of the parties." *Id.* (emphasis added).

¶306. The majority emphasizes that the racial discrimination in *Flowers* (racial discrimination that, like today, this Court found perfectly acceptable) was "extraordinary," "exceptional," and "unusual." Maj. Op. ¶¶ 49, 63. But neither the Constitution nor the United States Supreme Court precedent forbids only extraordinary, exceptional, or unusual racial discrimination. Indeed, any racially discriminatory strikes in jury selection are forbidden *in toto*: "a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *Id.* at 2234. This Court now appears to assert that racial discrimination that evinces itself in a more ordinary, unexceptional, or usual manner is perfectly acceptable in jury selection. Yet, the Supreme

122

Court has made abundantly clear that any racial discrimination in jury selection violates the Constitutional rights of both the defendant and the jurors in question.

## 2. State's Behavior

¶307. "[I]n the real world of criminal trials against black defendants, both history and math tell us that a system of race-based peremptories does not treat black defendants and black prospective jurors equally with prosecutors and white prospective jurors." *Flowers*, 139 S. Ct. at 2242. Both that math and history are clearly present in this case.

¶308. First, the majority disregards the math during its *Batson* analysis. While the majority notes the math in its acknowledgment that the trial court found that Clark made a prima facie case of discrimination, it seems to have left the math out of the substantive *Batson* analysis. Yet, a court should also consider "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case" in its ultimate determination of pretext. *Flowers*, 139 S. Ct. at 2243.

¶309. After initial juror qualification, the jury venire consisted of 165 potential jurors, fifty-seven, or approximately 34.5 percent, of whom were African-American. The State ultimately passed on thirty-eight jurors. Eight of those jurors, or approximately 21 percent, were black. Thirty of those jurors, or approximately 79 percent, were white. The State used all of its twelve peremptory strikes. Seven of those strikes, or 58 percent, were used on black jurors. Five of those strikes, or 42 percent, were used on white jurors. Thus, the State struck 87.5 percent of the black jurors it encountered and only 16.7 percent of the white jurors it encountered. The jury ultimately consisted of eleven white jurors, one black juror, and two

123

white alternate jurors. Thus, black jurors made up 7 percent of the fourteen jurors seated. The math in this case is stark and evinces a strong disparity of treatment between black and white jurors. Further, the State's decision to accept one black juror may be viewed "skeptically" as "an attempt 'to obscure the otherwise consistent pattern of opposition to' seating black jurors." *Flowers*, 139 S. Ct. at 2246 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 250, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005)). In *Flowers*, the United States Supreme Court concluded that "the State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2246.

¶310. Second, a court must consider "relevant history of the State's peremptory strikes in past cases[.]" *Flowers*, 139 S. Ct. at 2243. The Madison County District Attorney's Office that prosecuted Clark's case on behalf of the State has recently demonstrated its proclivity for striking black jurors. *Eubanks v. State*, 291 So. 3d 309 (Miss. 2020). In *Eubanks*, eight of the thirty-five jury venire members, or 22 percent, were black. *Id.* at 327 (King, P.J., dissenting). The Madison County District Attorney's Office prosecuted the case on behalf of the State. *Id.* The State used all six of its six peremptory strikes, or 100 percent, against black jurors. *Id.* This resulted in the State striking 75 percent of the black jurors it passed upon and 0 percent of the white jurors it passed upon. This Court should consider this emerging pattern.[12]

_____

[12]In *Eubanks*, I noted that this Court had examined 117 substantive, race-based *Batson* challenges, 105 involving strikes of black jurors and fifteen involving strikes of white jurors (the total numbers being slightly disparate because three cases involved both). *Eubanks*, 291 So. 3d at 325 n.11 (King, P.J., dissenting). In the 105 cases in which the trial

¶311. Third, a court must consider "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case[.]" **Flowers**, 139 S. Ct. at 2243. The State investigated two of the black jurors, pulling records of people with the same last name who had been arrested or prosecuted in Madison County. The State did not question these jurors regarding whether there actually was any connection to the people on the lists. No evidence exists that the State had investigated similarly situated white jurors it accepted, many of whom had common last names, for example, Powell, James, King, Meek, Taylor, Atkins, Green, and Morgan. Indeed, several white jurors stated on their juror questionnaires that they had family members who had been arrested, including some in Madison County. Yet, these jurors were not investigated. During general voir dire, the State asked whether anyone had a close friend or family member who had been prosecuted for a felony. The State noted that "as it relates to family members, I'm not worried about your third cousin twice removed that you see every fifth year at the family reunion, okay?"

### 3. *Individual Jurors*

¶312. A court must consider "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case" when determining

---

court found *no **Batson*** violation for the strikes of *black* jurors, this Court had affirmed one hundred of them. ***Id.*** at 325. In the thirteen cases in which the trial court *did* find a ***Batson*** violation for the strikes of *white* jurors, this Court had affirmed eleven of them. ***Id.*** This Court had affirmed both cases in which the trial court found no ***Batson*** violation for the strikes of white jurors. ***Id.*** This Court has now decided 119 substantive, race-based ***Batson*** challenges, 106 of them involving black jurors and sixteen involving white jurors. *See* Appendix A. In the 106 cases in which the trial court found *no **Batson*** violation for the strikes of *black* jurors, this Court has affirmed 101 of them. In the fourteen cases in which the trial court *did* find a ***Batson*** violation for the strikes of *white* jurors, this Court has affirmed twelve of them.

125

pretext. *Flowers*, 139 S. Ct. at 2243. Such side-by-side comparisons "cannot be considered in isolation[,]" but must be examined "in the context of all the facts and circumstances." *Id.* at 2250. The majority appears to examine each juror and side-by-side comparisons in isolation, instead of in the context of all facts and circumstances surrounding the State's use of its strikes. In *Flowers*, the United States Supreme Court found this Court's examination of juror strikes in isolation to be error, and the majority repeats that error in this case. *Id.*

¶313. I agree with the trial court and the majority that the State's reasoning for its strike of Juror Number 24, Ricky Ammons, was acceptable, given that Clark's attorney had previously represented him. I also agree that the reasons given for striking Juror Number 2, Judith Alexander, were acceptable given her age and that she stated her opposition to the death penalty under any circumstances. I agree that Juror Number 81, Fredia Day, made professions during her individual voir dire that she would require "absolute certainty" before imposing the death penalty that render her strike acceptable under *Batson*. For the remaining four black jurors struck by the State, the trial court erred by failing to find pretext for those strikes.

a. *Juror Number 6, Alicia Esco-Johnson*

¶314. The State cited Esco-Johnson's past research paper on the death penalty, her shared (maiden) last name with people arrested and prosecuted in Madison County garnered from its independent investigation of her, and the fact that she went to the same middle school as Clark as reasons for striking her. The prosecutor stated the assumption based on her past research that "I took from that that she considered herself a self-educated expert on the death

126

penalty and the program." The trial court found the strike proper because Esco-Johnson shared the same last name as persons arrested in Madison County and based on her past death penalty research, but found that her attending the same middle school as Clark was an inappropriate reason for a strike because she testified under oath that she did not know Clark.

¶315. Esco-Johnson, an African-American, wrote in her questionnaire that she believed the death penalty to be financially wasteful, but she opined that if the cost was better, it would be useful. She answered on the questionnaire that she is neither opposed to nor in favor of the death penalty and that her decision regarding the death penalty would depend upon the facts and circumstances of the case. She also agreed with the law of felony murder. During her individual voir dire, she stated that she does not "have any problems with" the death penalty. She clarified that "[t]he only thing I knew about it was that it cost more than – than a life sentence. That's the only thing that I ever have really known about the details of it so that's what I stated on my paper." The prosecutor clarified that "[w]hen you talk about cost more, we're talking about dollars and cents? . . . dollars and cents and the taxpayers to the State; is that correct?" When asked whether she could put that aside, Esco-Johnson responded, "It's not even a factor." She indicated multiple times that she had no problems imposing the death penalty.

¶316. Juror Number 62, Lindsay Henley, a white juror accepted by the State, also indicated a concern with taxpayer dollars. On her questionnaire, she indicated that she did not like paying her tax dollars to keep criminals in jail. The prosecution went to great pains to ask Henley if she understood that "dollar [sic] and cents really aren't an issue here" and to ensure

127

that Henley understood that. Upon Henley's affirmation that she understood that, she was accepted by the State. Yet, the State rejected Esco-Johnson despite her having stated that taxpayer dollars were "not even a factor" for her in deciding whether to impose the death penalty.

¶317. Further, the State's assertion that Esco-Johnson "considered herself a self-educated expert on the death penalty and the program" is disingenuous at best. Esco-Johnson gave no indication that she considered herself an expert. Indeed, she stated that the cost of the death penalty was "the only thing I knew about it." During all of voir dire, she did not evince any specialized knowledge of the law, nor did she make any statements indicating any beliefs on her part of expertise in the law.

¶318. Additionally, Esco-Johnson indicated under oath that she did not have any close family members who had been prosecuted for felonies. Her questionnaire indicated that no close family member had been arrested. Yet, the State investigated her maiden name and produced a list of parties with that name who had been arrested or prosecuted in Madison County, despite the prosecution's statement that it did not "care" about distant family members. The prosecution did not question Esco-Johnson regarding her relationship or lack thereof to any of those people. The State introduced this evidence for the first time during the *Batson* hearing, and the information was previously unknown to the defense. The defense pointed out that they had asked the State for any information they would use in voir dire, that the State did not give them this information, and that this information was withheld until the *Batson* hearing. Interestingly, the majority does not fault the State for surprising

128

the defense with this investigation, but it faults the defense with failing to adequately respond to the surprise information, even though such a response was directly caused by the State's withholding of the information. The fact that this information was withheld from the defense and used at the ***Batson*** hearing for the first time without notice is certainly other facts and circumstances that must be considered in a ***Batson*** analysis, and it indicates that the reasons for the strike are pretext for discrimination. Indeed, those with close family members who had been prosecuted had the opportunity during general voir dire to explain what happened and how they perceived the criminal justice system in spite of the prosecution.

¶319. Moreover, the State accepted several white jurors whose family members had been arrested and prosecuted, including those whose family members had been arrested, prosecuted, and/or incarcerated in Madison County. Gary James (white), Juror Number 17, was accepted despite his stepson's multiple prosecutions in Madison County. The State also accepted Juror Number 34, Robert Bruce McFarland (white), despite his having had a family member arrested in Madison County. Several other accepted white jurors likewise indicated that a family member had been arrested or prosecuted. That the State accepted white jurors whose close relatives had much more involvement in the criminal justice system than did Esco-Johnson's indicates pretext and racial bias, as does its pretrial investigation of only black jurors.

¶320. The majority attempts to compare apples to oranges, asserting that white jurors whose close relatives had significant involvement in the criminal justice system were in favor of capital punishment, all while faulting the defense for not coming up with better arguments

to the surprise information withheld by the State until the ***Batson*** hearing. Yet, the State did not cite opposition to capital punishment as a reason for striking Esco-Johnson. Indeed, Esco-Johnson testified she is not opposed to capital punishment. The majority now compares jurors based on reasons not even suggested or given by the State or considered by the trial court in order to justify the strike of a black juror. Moreover, if we must compare apples to oranges, many white jurors, as described below in the analysis of Juror Luckett, answered their questionnaires and voir dire questions indicating significantly more opposition to the death penalty than did Esco-Johnson. If Esco-Johnson's more neutral stance on the death penalty was truly the main reason for her strike, then certainly the State should have struck white jurors more opposed to the death penalty if Esco-Johnson's strike were not pretext for discrimination.

¶321. Based on the statistical evidence regarding the strikes, the disparate investigation as between Esco-Johnson and white jurors, and the side-by-side comparisons showing that similarly situated white jurors were accepted by the State, the State's reasoning for striking Esco-Johnson amounts to pretext for discrimination, and the strike violated ***Batson***.

        b.      *Juror Number 28, John Majors*

¶322. The State justified its strike of Majors, an African-American, based on his answer of "no" to Question 41 on the questionnaire, that the State believed Majors had an "issue" with the death penalty on individual voir dire, that his wife works for the Mississippi Supreme Court, and that he had gone to same middle school as Clark. The trial court found the strike

appropriate based on his answer to question 41 and noted that he had "[s]ome issue with the death penalty."

¶323. Question 41 asked, "The law in the state of Mississippi says that an intentional murder (the intentional taking of a life without legal excuse or justification) committed in the course of a robbery is a capital murder for which the death penalty may be imposed. Do you agree with this law?" The question specified that the murder must be *intentional*. The prosecutor questioned Majors about his answer during his individual voir dire. Majors stated, "[I]f it was intentional, yes, I do believe in that law. If it wasn't, no, I don't." Majors evinced a clear agreement with what the law is: that an intentional killing may be punished by the death penalty. He further stated if "I'm going in to rob and do whatever it takes to get the money, yes, I do . . . I do believe in the death penalty, I mean, if it was intentional." Majors made clear that he believed any intentional killing in the course of a robbery could receive the death penalty, which is exactly what the law and question 41 state. He clarified that he did not believe an accidental killing in the course of a robbery should be punished by the death penalty. The defense attorney clarified with Majors that he did not quite understand the law or question at hand when filling out the questionnaire before having the opportunity to come to court and listen to all the recitations of the law and the death penalty process. Majors clearly indicated that he could apply the law as instructed.

¶324. In disparate questioning to white jurors, the State took great pains to clarify that some of the answers white jurors gave on the questionnaire were given before they came to court and before they fully understood what the law was. The State asked no such question of

131

Majors. During Kyra Scruggs's (white) individual voir dire, the State clarified that she had learned more in the past day and a half in court about the death penalty and made sure she stated her new understanding that "we're not in a biblical setting." During Wendy Powell's (white) individual voir dire, the State noted that "you filled out a questionnaire sometimes back" and noted that now that she has been in court, it had "gotten real" and asked her if she understood the process now. The State clarified that she now understood that the court follows the law and not the Bible and asked, "Now having sat through this process and understanding that the Defense will put on mitigating things . . . can you consider both . . . ?" During Jeanne Biddle's (white) examination, the State noted that she had filled out the questionnaire a month before and clarified, "Well, you've probably learned a little bit more in the last few days since you've been here . . . ." To Brenda Hensarling (white), the State noted that she filled out the questionnaire on September 10 and noted that "[n]ow that you've had two days of listening to all of this and you're in the process . . . you understand probably more now than you did when you filled out this questionnaire, right?" During Lindsey Henley's (white) voir dire, the State noted that she filled out the questionnaire in August and noted that it was before she had "sat through a death penalty voir dire" before clarifying her statements now that she had heard the law. During Dennis Meek's (white) voir dire, the State noted that he filled out the questionnaire a month before and "in the last few days you've probably heard a lot and so you understand the process a little bit better." During Gary James's (white) individual voir dire, the State noted that he had filled out the questionnaire "before you had the benefit – of having sat through the last day-and-a-half[]"

and ensured that he now better understands the law regarding mitigating factors. During Amanda Kilgore's (white) individual voir dire, the State noted that she filled out the questionnaire a month before, while noting her views that the death penalty should be nearly automatic, and asked, "Now you've sat through this process the last couple of days. Do you have a greater understanding for what goes on here?" The State, over and over again, went to great pains to establish that white jurors who may have misapprehended the law on their questionnaires then understood the law. The State made no such effort with Majors, and such disparate questioning indicates pretext.

¶325. Moreover, the State accepted several white jurors who, while they either answered "yes" to or did not answer question 41, gave nearly identical answers to that of Majors during voir dire. For example, Houston (white) put a question mark as her response to question 41, and the State did not significantly question her regarding this. When Biddle (white) was questioned about whether the death penalty was appropriate for a killing in the course of a robbery, she responded, "[d]epending on what was going on it could be."

¶326. Furthermore, the State's assertion that Majors expressed an "issue" with the death penalty during individual voir dire is not supported by the record. This Court considers "a prosecutor's misrepresentations of the record when defending the strikes during the ***Batson*** hearing[.]" ***Flowers***, 139 S. Ct. at 2243. On his questionnaire, he responded "D" to question 36, that he is "in favor of capital punishment except in a few cases where it may not be appropriate." During individual voir dire, Majors stated that he is in favor of the death

133

penalty for intentional killings. Majors expressed no reservations about or "issues" with the death penalty as a general matter.

¶327. Based on the statistical evidence regarding the strikes, the disparate questioning of Majors as compared to white jurors, the side-by-side comparisons showing that similarly situated white jurors were accepted by the State, and the prosecutor's misrepresentation of the record during the **Batson** hearing, the reasons for the strike of Majors were pretextual for discrimination and violated **Batson**.

        c.        *Juror Number 46, Kathy Luckett*

¶328. The State justified its strike of Luckett, an African-American, because she wrote "it depends" on questions 35, 40, 41 of the questionnaire and because her last name was the same as multiple people arrested and prosecuted in Madison County, as evinced by the State's investigation of Luckett. To explain its stance on Luckett's "it depends" answers, the State asserted that "[t]he State is not accepting anybody that equivocates on their questionnaire on the death penalty or anything they said during individual voir dire." The trial court found the strike to be proper based on both grounds.

¶329. Luckett had answered "D" to question 36, that she is "in favor of capital punishment except in a few cases where it may not be appropriate." This Court must consider "a prosecutor's misrepresentations of the record when defending the strikes during the **Batson** hearing[.]" **Flowers**, 139 S. Ct. at 2243. The prosecutor's statement that it did not accept anybody who equivocated on the death penalty was categorically untrue. In fact, the State accepted several white jurors who equivocated on the death penalty much *more* so than did

134

Luckett. Furthermore, it accepted several white jurors who, as did Luckett, stated that imposition of the death penalty would depend on the circumstances, which also is what the law provides. For example, Meek (white) indicated on his questionnaire that he thought the death penalty was appropriate for extremely heinous cases and he answered question 36 with "B," that he is "opposed to capital punishment except in a few cases where it may be appropriate." During individual voir dire, Meek spoke of his involvement in prison ministries and the record indicates that he cried during his individual voir dire in speaking about it. He stated that "[t]aking a life, even that of a convicted felon, is a very serious act."[13] He reaffirmed that it depends on the facts and circumstances and stated that the death penalty "should only be done in extreme cases." The State noted to Meek regarding the death penalty that "you're hesitating a little . . . ." and that "[y]ou're kind of middle of the road . . . ." Thus, in its own statements during Meeks's individual voir dire, the State admitted that he was equivocating on the death penalty. Yet, the State accepted him as a juror. Biddle's (white) questionnaire indicated that she was not opposed to the death penalty, and she answered question 36 with "C," that she is "neither generally opposed to nor in favor of capital punishment." During individual voir dire, the State asked her if the death penalty was appropriate when someone is killed during the course of a robbery, and Biddle responded, "[d]epending on what was going on it could be." She further indicated that the death penalty

---

[13]The majority repeatedly responds to this dissent's direct quotes from the trial transcript and trial record by asserting that the dissent merely "contends" or that the direct record quote is somehow "according to the dissent." Maj. Op. ¶¶ 84, 85, 86, 88. This dissent does not falsely quote the record. The quotations here accurately quote the trial record.

135

may be appropriate if a crime "was especially violent . . . ." She noted that "If circumstances warranted it, I would do it if I had to." Schommer (white) indicated on his questionnaire that he felt that the death penalty was sometimes acceptable and answered question 36 with "B," that he is "opposed to capital punishment except in a few cases where it may be appropriate." During individual voir dire, he stated, "I think it depends on the case. I don't feel strongly one way or the other." On her questionnaire, Green (white) indicated that she was more in favor of life sentences than the death penalty in response to question 35. In response to question 36, she responded with "B," that she is "opposed to capital punishment except in a few cases where it may be appropriate." During individual voir dire, the trial court asked her if she had any conscientious scruples in applying the death penalty and she responded, "I think it depends on the case. I don't feel strongly one way or the other." Hensarling (white) indicated on her questionnaire in response to question 35 that "[i]t depends on the case - crime[.]" She responded "C" to question 36, that she is "neither generally opposed to nor in favor of capital punishment."

¶330. Furthermore, under oath, Luckett indicated that she did not have any close family members who had been prosecuted for a felony. Yet, the State investigated her last name and produced a list of parties with a shared name who had been arrested or prosecuted in Madison County, despite the prosecution's statement that it did not "care" about distant family members. The prosecution did not question Luckett regarding her relationship or lack thereof to any of those people. The State introduced this evidence for the first time during the ***Batson*** hearing, and the information was previously unknown to the defense. The

defense pointed out that they had asked the State for any information they would use in voir dire, that the State did not give them this information, and that this information was withheld until the **Batson** hearing. Interestingly, the majority does not fault the State for surprising the defense with this investigation, but it faults the defense with failing to adequately respond to the surprise information, even though such a response was directly caused by the State's withholding of the information. The fact that this information was withheld from the defense and used at the **Batson** hearing for the first time without notice certainly constitutes other facts and circumstances that must be considered in a **Batson** analysis, and indicates that the reasons for the strike are pretext for discrimination. Indeed, those with close family members who had been prosecuted had the opportunity during general voir dire to explain what happened and how they perceived the criminal justice system in spite of the prosecution. Moreover, the State accepted several white jurors who had family members who had been arrested and prosecuted, including those whose family members who were arrested, prosecuted, and incarcerated in Madison County. Gary James (white) was accepted despite his stepson's multiple prosecutions in Madison County. The State also accepted McFarland (white), despite his having a family member arrested in Madison County. Several other accepted white jurors likewise indicated that a family member had been arrested or prosecuted. That the State accepted white jurors whose close families had much more involvement in the criminal justice system than did Luckett's indicates pretext, as does its investigation of only black jurors in this manner.

¶331.  Based on the statistical evidence regarding the strikes, the disparate investigation as between Luckett and white jurors, the side-by-side comparisons showing that similarly situated white jurors were accepted by the State, and the State's misrepresentations of the record during the ***Batson*** hearing, the reasons for striking Luckett were pretext for discrimination and violated ***Batson***.

> d.  *Juror Number 61, Monshea Love*

¶332.  The State justified the strike of Love, an African-American, because he indicated on his questionnaire and in individual voir dire that he personally believed that killing by the State was wrong.  It also stated that his son was the same age as the victim, which the State believed would make Love not pay attention despite Love's saying that would not impact him.  Further, the State claimed that Love had once met with the district attorney about a shoplifting case that the district attorney then did not prosecute.  The trial court found the strike acceptable based on Love's views on the death penalty.

¶333.  On his questionnaire, Love indicated that he believed murder by the State in the form of the death penalty was wrong.  He marked "C" in response to question 36, that he is "neither generally opposed to nor in favor of capital punishment."  He marked "C" on question 39, that his "decision on whether to give the death penalty would depend upon the facts and circumstances of the case."  He marked "yes" to question 41 that he agreed with the felony murder law, and "yes" to question 42 indicating that he believes that the death penalty is a deterrent to crime.  On voir dire, Love stated that he could impose the death penalty.  He stated that "I'm against, you know, murder of any type, but I understand it's the

law.  And I understand that I've never had anybody taken from me so I don't know how I would feel if one of my sons were taken away from me.  So it's the law so I would follow the law."  The State asked him if his personal views in opposition to the death penalty "would that impair your ability to follow the law at all?" and Love answered "no."  Love's views on the death penalty were similar to multiple white jurors, including Biddle's, who indicated hesitation about the death penalty, but said that she would impose it if she "had to."  Further, Henley's (white) questionnaire likewise indicated her having a problem with State imposition of the death penalty, stating, "I don't believe we should have laws against killing, but kill people who break those laws."  Meek (white) also indicated his hesitation with the death penalty, but stated that he "believe[d]" he could impose the death penalty because "[t]he law trumps my feelings."  The State asked if he could set aside his personal feelings on the death penalty and follow the law.  He explained that "my personal feelings are not – I – I can't separate myself from those, but that is not part of the job description as I see it."

¶334. Based on the statistical evidence regarding the strikes and the side-by-side comparisons showing that similarly situated white jurors were accepted by the State, the strike of Love was discriminatory, the State's reasons for it were pretextual, and the strike violated ***Batson***.

### 4.	*Conclusion*

¶335.  The strikes of four black jurors were discriminatory in violation of both Clark's and those jurors' constitutional right to be free of racial discrimination.  The statistical evidence demonstrating the State's large disparity in striking black jurors in comparison to striking

white jurors is stark. The State's investigation of black jurors was disparate as compared to white jurors, none of whom it investigated, despite several with common names and several with relatives who had been through the criminal justice system. The State's disparate questioning of black jurors as compared to white jurors evinces an attempt to find pretextual reasons to strike black jurors. The prosecutor's misrepresentations of the record during the *Batson* hearing to justify the strikes of black jurors further indicate pretext. And the side-by-side comparisons of struck black jurors to similarly situated white jurors provides strong evidence of pretext, particularly in the context of all the relevant circumstances. Consequently, this Court should reverse Clark's conviction and remand the case to the circuit court for further proceedings.

**KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**

**APPENDIX A TO PRESIDING JUSTICE KING'S DISSENT**

1. *Stewart v. State*, 291 So. 3d 738 (Miss. 2020).

2. *Eubanks v. State*, 291 So. 3d 309 (Miss. 2020).

3. *Jones v. State*, 252 So. 3d 574 (Miss. 2018).

4. *Thomas v. State*, 249 So. 3d 331 (Miss. 2018).

5. *Flowers v. State*, 240 So. 3d 1082 (Miss. 2017), *reversed by Flowers v. Mississippi*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019); *Flowers v. State*, 158 So. 3d 1009 (Miss. 2014).

6. *H.A.S. Elec. Contractors, Inc. v. Hemphill Const. Co., Inc.*, 232 So. 3d 117 (Miss. 2016).

7. *Cox v. State*, 183 So. 3d 36 (Miss. 2015).

8. *Hartfield v. State*, 161 So. 3d 125 (Miss. 2015).

9. *McCoy v. State*, 147 So. 3d 333 (Miss. 2014).

10. *Corrothers v. State*, 148 So. 3d 278 (Miss. 2014).

11. *Batiste v. State*, 121 So. 3d 808 (Miss. 2013).

12. *States v. State*, 88 So. 3d 749 (Miss. 2012).

13. *Bailey v. State*, 78 So. 3d 308 (Miss. 2012).

14. *Davis v. State*, 76 So. 3d 659 (Miss. 2011).

15. *Birkhead v. State*, 57 So. 3d 1223 (Miss. 2011).

16. *Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

17. *Long v. State*, 33 So. 3d 1122 (Miss. 2010).

18. *Booker v. State*, 5 So. 3d 356 (Miss. 2008).

19. *Estate of Jones v. Phillips*, 992 So. 2d 1131 (Miss. 2008).

20. *Pruitt v. State*, 986 So. 2d 940 (Miss. 2008).

21. *Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

22. *Strickland v. State*, 980 So. 2d 908 (Miss. 2008).

23. *Hicks v. State*, 973 So. 2d 211 (Miss. 2007).

24. *Flowers v. State*, 947 So. 2d 910 (Miss. 2007).

25. *Mingo v. State*, 944 So. 2d 18 (Miss. 2006).

26. *Chester v. State*, 935 So. 2d 976 (Miss. 2006).

27. *Le v. State*, 913 So. 2d 913 (Miss. 2005), *overruled on other grounds*.

28. *Jones v. State*, 904 So. 2d 149 (Miss. 2005).

29. *Thorson v. State*, 895 So. 2d 85 (Miss. 2005).

30. *Johnson v. State*, 875 So. 2d 208 (Miss. 2004).

31. *Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

32. *Branch v. State*, 882 So. 2d 36 (Miss. 2004).

33. *Gaskin v. State*, 873 So. 2d 965 (Miss. 2004).

34. *Perkins v. State*, 863 So. 2d 47 (Miss. 2003).

35. *Howell v. State*, 860 So. 2d 704 (Miss. 2003).

36. *Burnett v. Fulton*, 854 So. 2d 1010 (Miss. 2003).

37. *Minor v. State*, 831 So. 2d 1116 (Miss. 2002).

38. *Smith v. State*, 835 So. 2d 927 (Miss. 2002).

39. *Horne v. State*, 825 So. 2d 627 (Miss. 2002).

40. *Caston v. State*, 823 So. 2d 473 (Miss. 2002).

41.   *Walker v. State*, 815 So. 2d 1209 (Miss. 2002).

42.   *Thomas v. State*, 818 So. 2d 335 (Miss. 2002).

43.   *Mills v. State*, 813 So. 2d 688 (Miss. 2002).

44.   *Hicks v. State*, 812 So. 2d 179 (Miss. 2002).

45.   *Randolph v. State*, 852 So. 2d 547 (Miss. 2002).

46.   *Hubbard v. State*, 819 So. 2d 1192 (Miss. 2001).

47.   *Weeks v. State*, 804 So. 2d 980 (Miss. 2001).

48.   *Carter v. State*, 799 So. 2d 40 (Miss. 2001).

49.   *Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

50.   *Drake v. State*, 800 So. 2d 508 (Miss. 2001).

51.   *Snow v. State*, 800 So. 2d 472 (Miss. 2001).

52.   *Stevens v. State*, 806 So. 2d 1031 (Miss. 2001).

53.   *Johnson v. State*, 792 So. 2d 253 (Miss. 2001).

54.   *Puckett v. State*, 788 So. 2d 752 (Miss. 2001.

55.   *Williams v. State*, 794 So. 2d 181 (Miss. 2001), *overruled on other grounds*.

56.   *Overstreet v. State*, 787 So. 2d 1249 (Miss. 2001).

57.   *Baldwin v. State*, 784 So. 2d 148 (Miss. 2001).

58.   *Manning v. State*, 765 So. 2d 516 (Miss. 2000).

59.   *Davis v. State*, 767 So. 2d 986 (Miss. 2000).

60.   *Gary v. State*, 760 So. 2d 743 (Miss. 2000).

61.   *Humphrey v. State*, 759 So. 2d 368 (Miss. 2000), *superseded by rule on other grounds*.

62.  *Webster v. State*, 754 So. 2d 1232 (Miss. 2000).

63.  *Jasper v. State*, 759 So. 2d 1136 (Miss. 1999).

64.  *McGilberry v. State*, 741 So. 2d 894 (Miss. 1999).

65.  *Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

66.  *Baldwin v. State*, 732 So. 2d 236 (Miss. 1999).

67.  *Taylor v. State*, 733 So. 2d 251 (Miss. 1999).

68.  *Fleming v. State*, 732 So. 2d 172 (Miss. 1999).

69.  *Berry v. State*, 728 So. 2d 568 (Miss. 1999).

70.  *Finley v. State*, 725 So. 2d 226 (Miss. 1998).

71.  *Gibson v. State*, 731 So. 2d 1087 (Miss. 1998).

72.  *Sewell v. State*, 721 So. 2d 129 (Miss. 1998).

73.  *Magee v. State*, 720 So. 2d 186 (Miss. 1998).

74.  *Walters v. State*, 720 So. 2d 856 (Miss. 1998).

75.  *Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

76.  *Manning v. State*, 726 So. 2d 1152 (Miss. 1998), *overruled on other grounds*.

77.  *Randall v. State*, 716 So. 2d 584 (Miss. 1998).

78.  *Booker v. State*, 716 So. 2d 1064 (Miss. 1998).

79.  *Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

80.  *McFarland v. State*, 707 So. 2d 166 (Miss. 1997).

81.  *Lester v. State*, 692 So. 2d 755 (Miss. 1997), *overruled on other grounds*.

82.  *Simon v. State*, 688 So. 2d 791 (Miss. 1997).

83. *Collins v. State*, 691 So. 2d 918 (Miss. 1997).

84. *Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

85. *Walker v. State*, 671 So. 2d 581 (Miss. 1995).

86. *Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

87. *Carr v. State*, 655 So. 2d 824 (Miss. 1995).

88. *Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

89. *Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

90. *Harper v. State*, 635 So. 2d 864 (Miss. 1994).

91. *Chase v. State*, 645 So. 2d 829 (Miss. 1994).

92. *Hatten v. State*, 628 So. 2d 294 (Miss. 1993).

93. *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds by* *Simon v. Mississippi*, 513 U.S. 956, 115 S. Ct. 413, 130 L. Ed. 2d 329 (1994).

94. *Dedeaux v. J.I. Case Co., Inc.*, 611 So. 2d 880 (Miss. 1992).

95. *Griffin v. State*, 610 So. 2d 354 (Miss. 1992).

96. *Griffin v. State*, 607 So. 2d 1197 (Miss. 1992).

97. *Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

98. *Abram v. State*, 606 So. 2d 1015 (Miss. 1992), *overruled on other grounds*.

99. *Bush v. State*, 597 So. 2d 656 (Miss. 1992).

100. *Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

101. *Govan v. State*, 591 So. 2d 428 (Miss. 1991).

102. *Willie v. State*, 585 So. 2d 660 (Miss. 1991), *overruled on other grounds*.

103. *Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

104.    *Turner v. State*, 573 So. 2d 657 (Miss. 1990).

105.    *Bradley v. State*, 562 So. 2d 1276 (Miss. 1990).

106.    *Sudduth v. State*, 562 So. 2d 67 (Miss. 1990).

107.    *Dennis v. State*, 555 So. 2d 679 (Miss. 1989).

108.    *Benson v. State*, 551 So. 2d 188 (Miss. 1989).

109.    *Davis v. State*, 551 So. 2d 165 (Miss. 1989).

110.    *Conerly v. State*, 544 So. 2d 1370 (Miss. 1989).

111.    *McDonald v. State*, 538 So. 2d 778 (Miss. 1989).

112.    *Wheeler v. State*, 536 So. 2d 1347 (Miss. 1988).

113.    *Chisolm v. State*, 529 So. 2d 635 (Miss. 1988).

114.    *Goggins v. State*, 529 So. 2d 649 (Miss. 1988).

115.    *Chisolm v. State*, 529 So. 2d 630 (Miss. 1988).

116.    *Dedeaux v. State*, 528 So. 2d 300 (Miss. 1988).

117.    *Johnson v. State*, 529 So. 2d 577 (Miss. 1988).

118.    *Taylor v. State*, 524 So. 2d 565 (Miss. 1988).

119.    *Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).